ROSEMARY LEDET, Judge.
bin this criminal case, the defendant, Keith Kirk, appeals his conviction on one count of second degree murder, in violation of La. R.S. 14:30.1, and the life sentence imposed on him. Mr. Kirk alleges two assignments of error: 1) that the trial court erred in denying his challenges for cause as to six prospective jurors, and 2) that the State failed to prove beyond a reasonable doubt that Mr. Kirk did not shoot and kill the victim, Tyrone Anderson, in self-defense. Finding no error, we affirm.

STATEMENT OF THE CASE

On October 29, 2009, Mr. Kirk was indicted by a grand jury for the second degree murder of Mr. Anderson. At his arraignment, Mr. Kirk plead not guilty. The trial court denied Mr. Kirk’s motions to suppress evidence, statement, and identification. Mr. Kirk was tried by a twelve-person jury on January 24-26, 2011. The jury unanimously found him guilty as charged. On February 25, 2011, the trial court sentenced Mr. Kirk to life imprisonment at hard labor without parole, probation, or suspension of sentence. This appeal followed.
| ^STATEMENT OF THE FACTS
It is undisputed that on that on August 14, 2009, Mr. Anderson was shot and killed by Mr. Kirk. The issue at trial was whether Mr. Kirk shot and killed Mr. Anderson in self-defense.
Detective Orlando Matthews, a New Orleans Police Department (“NOPD”) Officer, was dispatched to a homicide. After speaking with Cathy Anderson, one of Mr. Anderson’s sisters who lived with Mr. Anderson and their mother at the time, Det. Matthews developed Mr. Kirk and his brother, Kevin Kirk (“Kevin”), as suspects in the murder.
Ms. Anderson testified that she saw Mr. Kirk in their neighborhood for thirty days or more before the murder, but did not know his name. She stated she heard Mr. Kirk and Mr. Anderson talk before the shooting about a CD player. Mr. Anderson had obtained possession of a CD player belonging to Kevin. The Kirk brothers believed Mr. Anderson stole the CD player from Kevin. However, Ms. Anderson testified she overheard Mr. Anderson say that Kevin had given the CD player to him. Ms. Anderson also stated that, prior the shooting, she intervened in confrontations between Mr. Kirk and Mr. Anderson regarding the matter.
On the day of the shooting, Ms. Anderson reported to the police that she walked past two individuals from the neighborhood who were standing on the porch of their home speaking to Mr. Anderson. She indicated she exited the yard of the home and was approaching the intersection of Josephine Street and South Liberty when she heard gun shots being fired. She ran back to the family’s |sresidence where she saw two black males exit the yard towards Jackson Avenue. As she entered the residence she found Mr. Anderson on the floor suffering from gunshot wounds. Ms. Anderson ran back outside to yell at the two men but returned to the residence. Shortly after, Mr. Anderson died.
*938 At trial, Ms. Anderson gave a slightly different account of the events on the day of the shooting. On cross examination, Ms. Anderson denied she had seen the Kirk brothers on the front porch talking to Mr. Anderson shortly before the shooting. Ms. Anderson testified at trial she was sitting on the steps of a church on St. Andrew Street on the day of the shooting when she saw the Kirk brothers walking down Simon Bolivar Street toward Josephine Street. After they disappeared from view she began to walk home and was on S. Liberty Street when she encountered her mother walking in the opposite direction. She turned around to walk with her mother back down S. Liberty Street toward St. Andrew Street. Ms. Anderson said at about the time she got to Josephine Street and S. Liberty Street, she heard a gunshot. She ran home, heard another shot, and saw Kevin standing at the gate. As she got closer she saw Mr. Kirk and Kevin coming down the steps. Mr. Kirk put a gun in his pocket, and he and Kevin walked off. Ms. Anderson went inside to find Mr. Anderson shot and laying on the floor. She came back out to see Mr. Kirk and Kevin slowly walking off. She said her brother died there on the floor. The NOPD crime lab collected two shell casings from the scene.
4Later that evening, Ms. Anderson called Detective Matthews to alert him that she observed Mr. Kirk and Kevin run into a nearby house and gave him the address. Det. Matthews obtained a search warrant for the house based on the information from Ms. Anderson. Both Mr. Kirk and Kevin were arrested. The house was searched and no weapon was found. While at the police station, Mr. Kirk signed a “rights of arrestee” form, acknowledging that he understood his Miranda rights and wished to waive them. He then gave a recorded statement admitting to shooting Mr. Anderson. However, he indicated he shot Mr. Anderson in self-defense because Mr. Anderson threatened to shoot him. After Mr. Kirk gave his statement, Det. Matthews presented Ms. Anderson with a photographic lineup in which she identified the Kirk brothers as the ones she saw leaving her home after Mr. Anderson’s shooting.
Samantha Huber, M.D., conducted Mr. Anderson’s autopsy. The autopsy revealed Mr. Anderson had two penetrating gunshot wounds, both of which were fatal. One wound was to the left front chest and the other bullet entered on the left side of the chest, towards the back. Dr. Hubei-reported neither wound was a close or contact wound; both were “distant” wounds, fired from over eighteen inches to twenty-four inches away from the contact points. She also reported Mr. Anderson’s toxicology tests revealed cocaine and cocaine metabolites in the victim’s blood and urine. Dr. Huber noted the test showed that Mr. Anderson had most likely ingested cocaine the same day he was killed.

\ .DISCUSSION

ERRORS PATENT

A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR NO. 2

Mr. Kirk’s second assignment of error is that the State failed to prove beyond a reasonable doubt that he did not shoot and kill Mr. Anderson in self-defense.[1]
This court set forth the applicable standard of review for sufficiency of the evi *939 dence in State v. Huckabay, 00-1082, p. 82 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mus-sall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be | ^inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Huckabay, 2000-1082, p. 32, 809 So.2d at 1111, quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99,106-07.
The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A trier of fact’s determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
Mr. Kirk was convicted of the second degree murder of Mr. Anderson, a violation of La. R.S’ 14:30.1, which requires proof beyond a reasonable doubt that Mr. Kirk killed Mr. Anderson, while having the specific intent to kill him or inflict great bodily harm upon him. However, Mr. Kirk’s sufficiency of the evidence claim is limited to the issue of whether the State proved beyond a reasonable doubt that he did not act in self-defense.
A homicide is justifiable “[wjhen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.” La. R.S. 14:20(A)(1). In a homicide case in which the defendant asserts he |7acted in self-defense, the State has the burden of *940 establishing beyond a reasonable doubt that the defendant did not act in self-defense. State v. Taylor, 2003-1834, p. 7 (La.5/25/04), 875 So.2d 58, 63.
This Court has held that while there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not a person had a reasonable belief that deadly force was necessary to avoid the danger. State v. Batiste, 06-0875, p. 9 (La.App. 4 Cir. 12/20/06), 947 So.2d 810, 815 citing State v. McClain, 95-2546, p. 9 (La.App. 4 Cir. 12/11/96), 685 So.2d 590, 594. However, in 2006, the legislature amended La. R.S. 14:20(C) to provide:
A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided in this Section, and may stand his or her ground and meet force with force.
La. R.S. 14:20(C).
Even assuming that Mr. Kirk was not engaged in unlawful activity and was in a place where he had a right to be, and thus had no duty to retreat, viewing all the evidence in a light most favorable to the prosecution,' any rational trier of fact could have found beyond a reasonable doubt that Mr. Kirk could not have had a reasonable belief he was in imminent danger of losing his life or receiving great bodily harm and the killing was necessary to save himself from that danger.
Ms. Anderson confirmed in her testimony that Mr. Anderson had allegedly taken a CD player from Kevin and that he had previously talked to Mr. Anderson about this subject. This fact, combined with information about the CD player given by Mr. Kirk in his statement, is evidence that the confrontation between Mr. | sKirk and Mr. Anderson on the day of the shooting was likely over the CD player. The nature of the dispute was not one in which Mr. Kirk could have reasonably believed would put him in imminent danger of losing his life or receiving great bodily harm.
However, Mr. Kirk notes Mr. Anderson’s possible state of mind and his threatening appearance. The coroner who autopsied Mr. Anderson stated toxicology tests revealed cocaine and cocaine metabolites in his blood and urine, and that he had most likely ingested cocaine the same day he was killed. The coroner also confirmed Mr. Anderson had tattoos of a violent nature: a tattoo of a semiautomatic rifle and flames on his right bicep; a tattoo of the words “die by” with flames and bullets on his left bicep; and a tattoo of a “pixy” grim reaper with guns on his left arm. Mr. Anderson also had two teardrop tattoos next to his right eye, which Ms. Anderson said were in recognition of the death of the his brother.
According to Mr. Kirk, Mr. Anderson used hostile language towards him and apparently threatened to get a gun. Mr. Kirk alleged he went home to get his gun and to shoot the victim before Mr. Anderson shot him. However, Mr. Kirk said nothing about Mr. Anderson displaying a gun or other weapon at any time that day, or that he had made a move to get a gun or other weapon. Nor was there any evidence Mr. Anderson had physically accosted Mr. Kirk at any time or had attempted to do so. To the contrary, the only evidence of any physical contact between the two men was Mr. Kirk’s statement to the police that Kevin told him 19after the shooting he should not have shot Mr. Anderson because he had already punched him once.
Moreover, when a detective present at the taking of Mr. Kirk’s statement summed up his version of the events by asking him if he had just gotten “pissed off *941 and shot him,” Mr. Kirk replied in the affirmative. Further, Mr. Kirk stated he “got real mad” and shot Mr. Anderson for the following reasons: Mr. Anderson did not give him the CD player; Mr. Anderson told Mr. Kirk he was not scared of him; and Mr. Anderson told Mr. Kirk he was going to “get his,” which he interpreted as meaning his gun. Thus, Mr. Kirk admitted shooting the victim because he got mad at him, not because he reasonably believed he was in imminent danger of being killed by Mr. Anderson, or of receiving great bodily harm and the killing of Mr. Anderson was necessary to save him from that danger.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Mr. Kirk did not shoot the victim in self-defense.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, Mr. Kirk argues the trial court erred in denying his challenges for cause as to six prospective jurors. Mr. Kirk’s argument is the jurors should have been dismissed for cause because the respective jurors | inwere not impartial, under La.C.Cr.P. art. 797(2), or they would not accept the law as given to him by the court, under La.C.Cr.P. art. 797(4), or both.[2]
The purpose of voir dire is twofold: 1) to determine the qualifications of prospective jurors by testing their competency and impartiality; and 2) to assist counsel in articulating intelligent reasons for exercise of cause and peremptory challenges. State v. Ball, 00-2277, p. 23 (La.1/25/02), 824 So.2d 1089,1110.
A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Campbell, 06-0286, p. 73 (La.5/21/08), 983 So.2d 810, 858; State v. Leger, 05-0011, p. 66 (La.7/10/06), 936 So.2d 108, 155. Only where it appears, upon review of the voir dire examination as a whole, that the trial court’s exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the defendant, will an appellate court reverse that ruling. State v. Lee, 93-2810, p. 9 (La.5/23/94), 637 So.2d 102,108 citing State v. Passman, 345 So.2d 874, 880 (La.1977).
La. Const, art. 1, § 17 guarantees to a defendant the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. It is well settled in Louisiana that prejudice is presumed when a defendant’s challenge for |T1cause is erroneously denied, and the defendant has exhausted all of his peremptory challenges. State v. Carmouche, 01-045, p. 8 (La.5/14/02), 872 So.2d 1020, 1028. In the trial of a defendant for second degree murder, which is punishable necessarily by imprisonment at hard labor, each defendant has twelve peremptory challenges. La.C.Cr.P. art. 799. When a defendant uses all twelve of his peremptory *942 challenges, an erroneous ruling of a trial court on . a challenge for cause that effectively deprives him of one of his peremptory challenges constitutes a substantial violation of the defendant’s constitutional and statutory rights, requiring reversal of his conviction and sentence. State v. Juniors, 03-2425, pp. 7-8 (La.6/29/05), 915 So.2d 291, 304-305. Thus, to establish reversible error in the denial of one of his challenges for cause, a defendant needs to show: (1) that he exhausted all of his peremptory challenges; and (2) that the trial court erred in refusing to grant his challenge for cause. Carmouche, supra; Juniors, 03-2425, p. 8, 915 So.2d at 305.
In the instant case, the record reflects Mr. Kirk exhausted all twelve of his peremptory challenges during voir dire. Therefore, the question presented is whether the trial court erred in denying one of Mr. Kirk’s six challenges for cause of the following prospective jurors: Deidre Harper Hillard; Brandon T. Gates; Danell Marie Armour; David Hamilton; Barbara A. Davis; and Justin Matthew Jones.
Juror No. 1 — Deidre Harper Hillard
|12Ms. Hillard served on a criminal case the week before Mr. Kirk’s trial in which the jury found the defendant guilty as charged of attempted manslaughter. She replied in the affirmative when asked at one point by the prosecutor whether she could consider a verdict of guilty as charged if the State proved its case beyond a reasonable doubt. When asked by the prosecutor if she could still consider a verdict of guilty if the State proved all the elements of second degree murder but did not produce the weapon used in the killing, Ms. Hillard responded by stating she “may want to see the weapon.”
Later during voir dire, defense counsel questioned the prospective jurors of the first voir dire panel concerning the issue of the defendant acting in self-defense because the victim presented an actual danger to him versus the defendant reasonably believing that the victim presented an actual danger to him. Defense counsel also inquired as to whether the prospective jurors would require evidence that the victim had a weapon. Defense counsel asked:
BY MR. WEG:
How about you, Miss Hilliard? Could you still consider self-defense even though, let’s say you wouldn’t have believed that there was actual danger, but as the Judge would instruct, that the danger need not have been real as long as the defendant reasonably believed that he was in actual danger, that you would apply what you think is his reasonable belief?
BY JUROR HILLIARD:
Everybody’s different. I don’t know his circumstances. Maybe he feared for his life. Maybe another person in that situation would not have been fearful. But for whatever reason, he feared for his life, so I couldn’t make a decision without the victim having a weapon.
This was the extent of defense counsel’s questioning of Ms. Hillard on those issues. Defense counsel did not probe any further into this issue, even though the [ ispart of Ms. Hillard’s answer “so I couldn’t make a decision without the victim having a weapon” did not logically follow from the first part of that sentence.
When the trial court was hearing challenges for cause, the following colloquy occurred with regard to Ms. Hillard:
BY MR. WEG:
Number 1, Miss Hillard. She particularly had a problem with wanting a weapon. I think for the claim of self-defense, even if it’s instructed, and she also talked about the first one, because proving innocence or the Defense having some type of burden.
*943 BY THE COURT:
State, your position?
BY MR. PHILLIPS:
My position on that, Judge, when you ask people what I am supposed to do, then they are going to say a lawyer’s responsibility is to do for their client. That doesn’t mean what do you think my job is; nothing, to sit there and do nothing. Your job is about your client, a lawyer advises him. And, I mean, I don’t think it rose to a level of putting a burden on him. If anything, the people said, but I understand that it’s the State’s burden.
BY THE COURT:
I think the thing Miss Hillard — beyond a reasonable doubt, did make those comments. I think that upon her getting what you — then, she understood and went back and corrected it. I think that part of it was just not understanding what the law requires. I am going to deny your challenge for cause. I will note your objection.
It appears that defense counsel raised two issues in his complaint about Ms. Hil-lard, the first being that “she particularly had a problem with wanting a weapon” and the issue of self-defense. The second issue was just in general about the burden of proof, with a reference to Mr. Kirk having some type of burden to prove innocence. The comments of both the State and the trial court during the challenge conference appear to have been directed to the general issue of the burden of proof. Neither the prosecutor nor the trial court addressed defense ^counsel’s concern with Ms. Hillard stating, somewhat un-clearly, considering the context, she could not make a decision as to the claim of self-defense, specifically, as to whether defendant had a reasonable belief that he was in actual danger, “without the victim having a weapon.”
As noted above, Ms. Hillard had also told the prosecutor she “may” want to see the weapon in order to find beyond a reasonable doubt that Mr. Kirk shot Mr. Anderson.
In State v. Taylor, supra, the Louisiana Supreme Court reversed a decision by this court that reversed the defendant’s second degree murder conviction on the ground that the trial court wrongfully denied the defendant’s challenge for cause based on a prospective juror’s answer to a question concerning self-defense. The potential juror in the Taylor case stated during voir dire that “you would have to really prove to me that you could not get away from the situation and that the only way for you to escape death was to kill that person.” Taylor, 03-1834, p. 5, 875 So.2d at 62. The Louisiana Supreme Court acknowledged in a homicide prosecution where the defendant claimed self-defense, the State has the burden of burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. However, the Supreme Court noted the potential juror’s statement:
[Pjlaced in context, was made in response to defense counsel’s hypothetical questions concerning whether the number of gunshots would negate the defendant’s claim of self-defense. Specifically, defense counsel asked [the potential juror] if he drew a distinction based on that hypothetical question.
Taylor, 03-1834 at p. 7, 875 So.2d at 63.
11sOn the issue of hypothetical questions posed to potential jurors, the Supreme Court in Taylor stated:
“[V]oir dire does not encompass unlimited inquiry by defendant into all possible prejudices of prospective jurors, including their opinions on evidence, or its weight, hypothetical questions, or questions of law that call for any pre *944 judgment of supposed facts in the case.” [State v.] Ball, [2000-2277 (La.1/25/02), 824 So.2d 1089,] 1110. “Louisiana law clearly establishes that a party interviewing a prospective juror may not ask a question or pose a hypothetical which would demand a commitment or prejudgment from the juror or which would pry into the juror’s opinions about issues to be resolved in the case.” Id. “It is not proper for counsel to interrogate prospective jurors concerning their reaction to evidence which might be received at trial.” State v. Williams, 230 La. 1059, 89 So.2d 898, 905 (1956); see also State v. Smith, 216 La. 1041, 45 So.2d 617 (1950) (“hypothetical questions and questions of law are not permitted in the examination of jurors which call for a pre-judgment of any supposed case on the facts”).
Taylor, 08-1834 at p. 8, 875 So.2d at 64.
In addition, the Supreme Court in Taylor stated:
Further, in this case, the juror’s answers appear to be brought about “more from a lack of understanding of the law than bias,” and grounds for cause do not exist under these circumstances because a juror is not expected to be familiar with legal terms nor to “understand jurisprudential distinctions in an abstract context”
Taylor, 03-1834, at p. 7, 875 So.2d at 63, quoting Ball, 00-2277, p. 22 (La.1/25/02), 824 So.2d 1089,1109.
In the instant case, Ms. Hillard’s complained of statement, that she would need to see a weapon was made in response to defense counsel’s questions based on a hypothetical situation where the victim did not have a weapon. In Taylor, the Louisiana Supreme Court found this court’s “reliance on [the prospective juror’s] response to an improper hypothetical question as a ground for reversal was | ^improper,” and consequently reversed this court’s disposition of the defendant’s appeal. Taylor, 03-1834 at p. 9, 875 So.2d at 64.
The question posed to Ms. Hillard was about Mr. Kirk reasonably believing he was in actual danger as opposed to there being actual danger. One could easily credit her response to the question, suggesting she would not be able to make a decision without the victim having a weapon, to a lack of understanding of the law concerning the objective standard of “reasonable belief’ or “reasonableness” rather than her fixed decision about the victim needing to have possessed a weapon in order for her to find the defendant acted in self-defense.
As previously noted, defense counsel’s questioning of Ms. Hillard on the issue of self-defense and whether or not the victim had a weapon was very limited. He asked one question, she gave one answer, and defense counsel moved on. In subsequently questioning other prospective jurors on the same voir dire panel on this issue, the issue was significantly fleshed out, making for a better understanding of the abstract nature of a reasonable belief that the victim posed a threat of death or great bodily harm to defendant. For example, one prospective juror mentioned a hypothetical situation where the victim was an ex-boxer with “lethal hands,” stating “you have to look at a lot of factors.” Defense counsel explained to the juror:
Absolutely. And the question is at the core. Would you be able to consider all of the circumstances, right? We didn’t talk about any other kinds of threats or give you any information on whether the people knew each other, had other dealings. We’re not at the case now. It’s whether you would say absolutely not, right? I mean, the prosecutor wanted to be sure that just because there is no weapon, if 117there’s no *945 weapon found that connects the person accused to a crime, does that mean you’re absolutely automatically going to find not guilty. He asked that question essentially, right? So I’m just kind of asking the same thing on the other side. Would you be able to apply it the same way if you’re considering self-defense, even if there is no weapon on the other person, are you just going to say automatically — and if you say that, that’s your feeling. That’s your right. Is that what you’re saying, Miss Terry? You couldn’t find self-defense if there’s no weapon?
Viewing the voir dire of the first panel as a whole and recognizing that Ms. Hil-lard’s answer was in response to a hypothetical question, we find the trial court did not abuse its discretion in denying Mr. Kirk’s challenge for cause as to Ms. Hil-lard.
Juror No. 7 — Brandon T. Gates
Mr. Gates stated his oldest sister was a patrol officer in Jackson, Mississippi; his best friend was a Jefferson Parish Deputy Sheriff; and the best friend’s brother was a detective with the Jefferson Parish Sheriffs Office. Mr. Gates replied “No” when asked whether his relationships with those law officers would affect how he looked at the evidence or reviewed the testimony of police officers. Mr. Gates spoke often during voir dire. For example, when defense counsel asked if any prospective juror could think of some reasons why a defendant might not testify, Mr. Gates suggested the defendant could have been doing something wrong unrelated to the crime for which he was being tried, “like spying on [his] neighbor changing or something, that makes him look bad or something,” that would make him not want to testify.
In questioning prospective jurors about the issue of self-defense and a victim who did not have a weapon, Mr. Gates stated he was “really indecisive with the |18whoIe self-defense thing,” that he could see someone hating another person so much that he would provoke a fight and then, “if they grab a handkerchief, I’m going to kill them in self-defense. I don’t know. They can say, hey, that dude tried to choke me with a handkerchief.” Mr. Gates recounted that when he was in high school a smaller individual hated someone on the basketball team, so the smaller individual started a fight with the basketball player and stabbed him a few times, saying, “well, he’s bigger than me,” even though the smaller attacker’s intent from the beginning was to hurt the basketball player. Mr. Gates stated he “wouldn’t feel comfortable to say somebody used self-defense” based on his personal experience. When asked by defense counsel whether he could consider all the other factors, Mr. Gates said he could hear the whole story, “I don’t know, in terms of self-defense [sic] gets thrown out there so much.” However, Mr. Gates subsequently stated, “I feel that self-defense, yes, yes, you know if somebody is in real danger, you know, they should do anything to protect themselves.”
Mr. Gates was asked by defense counsel whether, even if he believed the danger was not real, he would be able to consider whether defendant reasonably believed he was in actual danger. Mr. Gates replied:
It has to take a lot for me, you know. No offense to him. He’s a big guy, you know. It depends on current danger, it [sic] depends on if somebody’s lying, you know. Somebody said like, they could say they physically threatened you, and you could say, well, I felt threatened. So I thought my life was in danger. So that’s why I killed this person, and that’s ridiculous. You would have to be physically — I’d have to see real danger. *946 rd have to know this person was in— even if they believed they was in real danger, they’d have to at least talk and let me know how terrified they were at the moment, you know. Just, I was scared for my life, so yeah, I stabbed him, that just don’t fly with me.”
11flDefense counsel replied by stating:
[Tjhere are going to be some other factors that the Judge will instruct if she’s instructing on self-defense. Some of the factors would include the excitement and confusion of the occasion, the possibility of preventing the danger by using force less than killing and knowledge of his assailant’s age or his character. So there’s other factors that you could also use. But For [sic] right now, I’m just trying to focus, I’m going to move to Miss Driscoll now. Thank you, Mr. Gates....
At the challenge conference defense counsel challenged Mr. Gates for cause because he was really talkative about the issue of self-defense and because he did not think Mr. Gates could follow the law.
The trial court believed Mr. Gates was talking about the aggressor doctrine and noted that defense counsel had not even voir dived on the aggressor doctrine. The trial court was correct that Mr. Gates’s example about the high school stabbing related to a smaller individual picking a fight with a larger basketball player, then stabbing that person and claiming self-defense, involved a set of circumstances defense counsel’s voir dire did not cover.
Moreover, Mr. Gates indicated in his last comments he could find that Mr. Kirk acted in self-defense if he reasonably believed he was in actual danger and he could accept the law as given to him by the trial court. Finally, as with Ms. Hillard and the other prospective jurors whose defense challenges for cause were based on their responses to questions concerning self-defense and the need for the victim to have had a weapon, the question about the weapon pertained to a hypothetical situation and to the respective prospective juror’s reaction to evidence which might |2nbe received at trial, which the Louisiana Supreme Court in Taylor, supra, stated was an improper basis for the grant of a challenge for cause.
Viewing Mr. Gates’ answers as a whole, we find the trial court did not abuse its discretion in denying Mr. Kirk’s challenge for cause as to Mr. Gates.
Juror No. IS- — Danell Marie Armour
Ms. Armour served on the same jury the previous week as Ms. Hillard, which found a defendant guilty as charged of attempted manslaughter. She had a friend who was a NOPD officer, but replied in the negative when asked whether that friendship would have an effect on her judging the credibility of police officers. Ms. Armour said her best friend had been murdered in September 2000 and no one was ever apprehended in the case. However, when asked whether this experience would make her think that because Mr. Kirk has been apprehended and accused that he was more than likely guilty, she replied in the negative, stating she believed everyone deserved a fair trial.
At one point when defense counsel was discussing whether Mr. Kirk should testify, Ms. Armour stated she understood the burden of proof. However, she stated if someone was innocent she would expect them to get up to defend himself or have his attorney present witnesses on his behalf, “even though I know that is not required.” Ms. Armour further stated “[w]ould I hold that against him, of course not.” When defense counsel asked the prospective jurors later what his or her verdict would be if the juror was not sure the State had proven its case beyond |21a *947 reasonable doubt and Mr. Kirk did not testify, Ms. Armour replied: “It would be not guilty.”
Mr. Kirk focuses on Ms. Armour’s comments when defense counsel asked the voir dire panel, whether, even if they thought a murder was committed, considering the circumstance, it could have been manslaughter. Ms. Armour stated she could definitely return a lesser verdict, but she went on to state that defense counsel’s question about the manslaughter verdict made her wonder if defense counsel was really convinced that his client was innocent. Defense counsel replied, explaining it was undisputed that a man had been killed and that his client, Mr. Kirk, had been arrested. He further explained it was part of his job to make sure that the jurors chosen would consider a manslaughter verdict.
Mr. Kirk admits Ms. Armour did not state outright that she could not be fair, but argues that her interpretation of defense counsel’s motives in asking if the prospective jurors could return the lesser verdict of manslaughter showed her predisposition to believe in defendant’s guilt, especially when considering that her best friend was murdered and the murder was never solved.
However, Ms. Armour expressly stated with regard to any possible prejudice or partiality on her part because of her friend’s murder that she believed everyone deserved a fair trial and she could not hold someone responsible for acts perpetrated by another. She also stated she could return the lesser verdict of manslaughter. At the challenge conference the trial court believed that despite Ms. Armour’s comment made in response to defense counsel asking about the lesser |22verdict of manslaughter, she had a firm understanding of the law and understood the presumption of innocence and the burden of proof.
Viewing Ms. Armour’s answers as a whole, it is not an abuse of discretion for the trial court to have found that Ms. Armour would be impartial and could follow the law as given to her by the trial court. Accordingly, we find there is no abuse in the trial court’s discretion in denying Mr. Kirk’s challenge for cause as to Ms. Armour.
Juror No. 18 — David Hamilton
Mr. Hamilton previously served on a civil jury that did not make an award of damages. He had a brother in California who was a police officer. Mr. Hamilton replied in the negative when asked whether he believed that, if the State did not prove its case beyond a reasonable doubt, he would have a problem finding defendant not guilty just because he had a brother in law enforcement.
Mr. Hamilton replied in the affirmative when defense counsel asked whether any of the jurors would have to see a weapon on the part of the victim, as to the issue of self-defense and defendant reasonably believing that his life was in danger. However, it is clear what Mr. Hamilton meant was that he could not find ’ self-defense based solely on an assertion by the defendant that he “was afraid for his life.” The following colloquy then occurred:
BY MR. WEG:
So even if the Judge tells you the danger need not have been real, as long as the defendant reasonably believed that he was in actual danger, you would not be able to put yourself in the position of the person accused of the crime? And it’s okay. I know it’s a hard thing to do.
| asBY THE COURT:
I think you’re asking him two different questions.
BY JUROR HAMILTON:
That’s what I’m trying to figure out.
*948 BY THE COURT:
I think you’re asking him if you would want to see the weapon if you’re alleging self-defense. But then you’re also asking him, can he follow the instructions. Those are two different things.
BY MR. WEG:
Let’s say there’s no weapon, just a hypothet.
BY JUROR HAMILTON:
One person had a weapon; one person didn’t have a weapon.
BY MR. WEG [sic]:
Right. So in other words, right, if somebody says I’m going to slit your throat, I’ve got a sword and I’m going to slit your throat, but no evidence that that person had a weapon. I would have to see something that that person had a weapon. I would have to see something to say that he was going — saying is not the probable cause to, in my opinion, is not probable cause to kill somebody. I have to really feel a threat that you are going to do it.
BY MR. WEG:
So you’re going to put yourself in the position, and you’re going to determine how you would have acted in that situation?
BY JUROR HAMILTON:
Yes.
BY MR. WEG:
Would you be able to, if the Judge instructs you that the danger need not have been real as long as the defendant reasonably believed that he was in danger? Would you be able to put yourself in the shoes of Mr. Kirk?
BY JUROR HAMILTON:
The danger wasn’t real? In other words, if I might have said, I’m going to cut your throat and didn’t have nothing to cut your throat with?
BY MR. WEG:
Yeah. Could you look at all the facts and circumstances to determine whether or not the person threatened reasonably believed that he was in actual danger.
124At that point the State objected to defense counsel asking Mr. Hamilton to put himself in the defendant’s shoes. The trial court sustained the objection, and defense counsel did not further question Mr. Hamilton on the issue until he was wrapping up the self-defense part of his voir dire questioning and was asking prospective jurors about needing a weapon. Defense counsel asked Mr. Hamilton:
BY MR. WEG:
Mr. Hamilton, what do you think?
BY JUROR HAMILTON:
I said before.
BY THE COURT:
Yes. You started with Mr. Hamilton.
At the challenge conference the trial court stated that it was going to deny any challenge for Mr. Hamilton as to the victim needing to have had a weapon, saying Mr. Hamilton said he would look at all the facts and circumstances.
Viewing Mr. Hamilton’s answers as a whole, it cannot be said he would absolutely need to see a weapon or he would not be impartial or not accept the law as given to him by the trial court. In addition, the question about the weapon pertained to a hypothetical situation and to prospective juror Mr. Hamilton’s reaction to evidence which might be received at trial, which the Louisiana Supreme Court in Taylor, supra, stated was an improper basis for the grant of a challenge for cause. Therefore, we find the trial court did not abuse its discretion in denying Mr. Kirk’s challenge for cause as to Mr. Hamilton.
*949 Juror No. 35 — Barbara A. Davis
| aMs. Davis, who was in the second voir dire panel, knew NOPD Crime Lab firearms examiner Kenneth Leary through his aunt. However, she replied in the negative when asked whether that could affect her ability to be a fair juror in the case. Ms. Davis served on a jury the week before Mr. Kirk’s trial that found a defendant not guilty of being a felon in possession of a firearm.
Defense counsel asked if anyone would require proof that the victim possessed a weapon in order to find self-defense. Counsel also explained a homicide is justifiable if committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or of receiving great bodily harm. Ms. Davis replied: ‘Tes. I would need to see a weapon on the part of the victim; some kind of weapon that would be a threat.” That was the extent of Ms. Davis’s response on the issue and defense counsel’s questioning of her on the issue. However, when asked later if, in determining whether Mr. Kirk acted in self-defense, the prospective jurors would give him the benefit of every reasonable doubt arising out of the evidence or lack of evidence, Ms. Davis stated she would.
The question about the weapon pertained to a hypothetical situation and to Ms. Davis’s reaction to evidence which might be received at trial, which the Louisiana Supreme Court in Taylor, supra, stated was an improper basis for the grant of a challenge for cause.
Further, viewing Ms. Davis’s answers as a whole, we find there was no abuse of discretion on the part of the trial court to conclude that Ms. Davis would |2fibe an impartial juror who would accept the law as given to her by the trial court, and thus deny Mr. Kirk’s challenge for cause as to her.
Juror No. 38 — Justin Matthew Jones
Mr. Jones, also in the second voir dire panel, was familiar with the block where the killing occurred, but replied in the negative when asked whether that would prevent him from being a fair juror. When defense counsel asked whether, if self-defense were raised, the jurors could consider it even if there was no weapon found on the victim, Mr. Jones replied that he “would have to hear from the defendant ... because self-defense is thrown around a lot.” When queried as to whether that meant he would disregard self-defense entirely or whether he could still look at all the facts and circumstances, Mr. Jones replied he could look at all the facts and circumstances but would still have to hear from defendant if he claimed self-defense. When asked whether, if defendant would not testify, and the judge instructed him on self-defense, he still would not consider self-defense at all, Mr. Jones replied: “I would lean more towards the State.” Mr. Jones replied in the affirmative when asked by defense counsel immediately thereafter whether he would hold the fact that Mr. Kirk did not testify against him.
At the challenge conference, in denying Mr. Kirk’s challenge for cause as to Mr. Jones, the trial court stated it had a problem with the way defense counsel’s questions were phrased, suggesting the prospective juror was grappling with understanding the concept of self-defense and how the use of deadly force was justified. The trial court stated there is no basis of a challenge for cause due to the l^juror wanting to hear from the defendant because in order for there to be self-defense there has to be some evidence of self-defense from the defendant. The trial court suggested that hearing from the defendant on the issue of self-defense could be in the form of a statement by *950 defendant and that is exactly what the sole evidence purportedly suggesting self-defense in the instant case consisted of: the recorded statement by Mr. Kirk given to Det. Matthews that was played for the jury.
Viewing Mr. Jones’ answers as a whole, in light of the Louisiana Supreme Court’s decision in Taylor, supra, we find the trial court did not abuse its discretion in determining that Mr. Jones could be an impartial juror and could accept the law as given to him by the trial court, and in thus denying Mr. Kirk’s challenge for cause as to this prospective juror.
This assignment of error is without merit.

DECREE

For the foregoing reasons, defendant’s conviction and sentence are affirmed.
AFFIRMED

. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Marcantel, 00-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55.

. La.C.Cr.P. art. 797 states, in pertinent part:
The state or the defendant may challenge a juror for cause on the ground that:
[[Image here]]
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
[[Image here]]
(4) The juror will not accept the law as given to him by the court; or....