DANIEL L. DYSART, Judge.
l iBinika Hankton was convicted by a unanimous jury in Orleans Parish Criminal District Court of the first degree murder of Henry Barber. She appeals the conviction and her mandatory life sentence, arguing that her conviction was based on an erroneous ruling on her motion to suppress the statement; that there was missing and/or insufficient evidence to support her conviction; that the trial court prejudi-cially limited voir dire; and that the trial court erred in denying her motion for a change of venue.
For the reasons that follow, we affirm the conviction and sentence.
PROCEDURAL BACKGROUND:
On September 15, 2009, 76-old Henry Barber was stabbed twenty-one times and bled to death. A grand jury indicted Bini-ka Hankton for first-degree murder in connection with Mr. Barber’s death on January 14, 2010, a charge to which she pled not guilty.
Ms. Hankton then moved to suppress her statement and the evidence. After a hearing, the trial court denied these motions,[1] and a trial commenced on August |230, 2011. Ms. Hankton was found guilty as charged by a unanimous jury. She was subsequently sentenced to life imprison *402 ment without the benefit of parole, probation or suspension of sentence.
FACTUAL BACKGROUND:
On September 17, 2009, Henry Barber was found stabbed to death in his home at 2018 St. Andrew Street, Apt. B, in New Orleans. The defendant, Binika Hankton, was the person who reported Mr. Barber missing to the police, leading to the discovery of Mr. Barber’s body.
According to the evidence adduced at trial, on September 15, 2009, Ms. Hankton spent most of the day with Mr. Barber, who employed her for various domestic work.[2] The following day (September 16, 2009), allegedly unable to reach the victim by telephone, Ms. Hankton went to his apartment, where she found his mail and newspaper uncollected. That evening, Ms. Hankton contacted the New Orleans Police Department (“NOPD”).
NOPD Officer Christopher Harris met Ms. Hankton at Mr. Barber’s apartment on the evening of September 16, 2009. Unable to gain entry to the apartment, Officer Harris and Ms. Hankton walked around the outside of the apartment but were unable to locate Mr. Barber. Officer Harris did not believe there was sufficient justification to force his way into the apartment.
The following morning (September 17, 2009), Ms. Hankton again contacted the NOPD over her concerns for Mr. Barber. She likewise contacted the manager of Mr. Barber’s apartment complex, Stanley Meyers, who testified that he also received a call from the NOPD that day asking for assistance at Mr. Barber’s ^apartment. Mr. Myers did not have a duplicate key and called a locksmith to the apartment. When he entered the apartment, he saw blood on the floor in the hallway and could see a leg hanging off of the bed in the bedroom. He immediately withdrew from the apartment and contacted the NOPD.
NOPD Homicide Detective Greg Hamilton testified that he was the first detective to arrive at Mr. Barber’s home.[3] Through information gathered by the other officers, he learned that Ms. Hankton had reported her concern for Mr. Barber and had made various inquiries regarding his well-being to others at Mr. Barber’s apartment complex. Detective Hamilton called Ms. Hankton from the murder scene asking to speak with her, as the last person known to have seen Mr. Barber. Ms. Hankton expressed willingness to cooperate in the investigation; and Detective Hamilton dispatched a unit to pick up Ms. Hankton and to bring her, along with her two young children, to the police station in order for her to be interviewed.
Ms. Hankton gave an initial statement to Detective Hamilton and Lead Detective Desmond Pratt around 2:30 or 3:00 that afternoon, in which she described the events that took place on the last day she saw Mr. Barber (September 15, 2009). She indicated that the morning consisted of running errands with Mr. Barber, after which she cooked for him, and that when she left his apartment that afternoon, he was “fine.” According to Detective Hamilton, at the time of this initial statement, Ms. Hankton was not a suspect in the murder, and as such, was not advised of her Miranda rights.
RDuring the time that Ms. Hankton spoke with Detectives Hamilton and Pratt, detectives were interviewing other witnesses and gathering evidence in connection with the investigation. Both Detectives Pratt and Hamilton testified that *403 some inconsistencies were discovered as a result of those other witnesses’ interviews and accordingly, they sought a second interview with Ms. Hankton.[4] Detective Hamilton testified that at the time of the second interview, Hankton was still not a suspect and she was not “limited to the room or handcuffed to a chair.” Ms. Hankton, too, testified she was free to go about at the police station during this time, and she visited with her children who were being watched by her aunt and uncle.
When the second interview with Ms. Hankton began in the early morning of September 18, 2009, Ms. Hankton stated at the outset “I’m going to tell you the truth.” Ms. Hankton then related that the last time she was with Mr. Barber, she backed into him as he was shaving and he cut himself. Believing that “this thing was not making sense,” Detective Hamilton stopped the interview, advised Ms. Hank-ton of her constitutional rights and obtained a signed waiver of rights from her. He then obtained Ms. Hankton’s statement, which was videotaped.[5] The videotaped statement given by Ms. Hankton essentially mirrored what Ms. Hankton had previously stated — that after she “fed” Mr. Barber, she wiped the table and then took him to the bank. When they returned to Mr. Barber’s apartment, he stated that he was “hurting real bad” and advised that he was going to lie down. She told him that she was going to go home, but before she did, she Rvacuumed the living room. At that point, Mr. Barber was “pulling hairs” in the area of his neck or nose with a sharp object (she could not identify). As she backed up, she inadvertently hit Mr. Barber causing him to puncture his throat with the sharp object he was using. Mr. Barber reportedly advised that he was all right, and Ms. Hankton noticed only a drop or so of blood. Assuring Ms. Hankton that he was fine, Mr. Barber went to lie down. The last time Ms. Hankton saw Mr. Barber was when he rose to close the front door as she left.
Ms. Hankton was not charged with Mr. Barber’s murder áfter the second' statement had been concluded. However, the subsequently received autopsy results revealed that Mr. Barber had been stabbed some 21 times to his neck, head, chest and torso, and Ms. Hankton was then charged with the first degree murder of Mr. Barber.
DISCUSSION
ASSIGNMENT OF ERROR NO. 4:[6]
We address the defendant’s fourth assignment of error first. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court is to first determine the sufficiency of the evidence. State v. Marcantel, 00-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55, citing State v. Hearold, 603 So.2d 731, 734 (La.1992).
In this assignment of error, the defendant concedes that Mr. Barber was murdered, but she maintains that there is no direct evidence connecting her to his murder and that the circumstantial evidence was insufficient to sustain her conviction.
IsThe standard of appellate review of a sufficiency of the evidence claim was set forth in the United States Supreme Court *404 decision of Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788-2789, 61 L.Ed.2d 560 (1979), which explained that “the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.” Louisiana courts have consistently applied the Jackson standard of review in assessing sufficiency of the evidence claims. This Court has repeatedly stated that, in discharging its duty to review the claims under the Jackson standard, an appellate court must not only look to whether “the record contains evidence that tends to support each fact necessary to constitute the crime,” but must “consider the record as a whole.” See State v. Danastasio, 12-1157, p. 8 (La.App. 4 Cir. 1/30/14), 133 So.3d 224, 229, quoting State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111 (internal citations omitted); State v. Taylor, 13-0265, p. 12 (La.App. 4 Cir. 12/18/13), 130 So.3d 439, 446; State v. Kirk, 11-1218, pp. 5-6 (La.App. 4 Cir. 8/8/12), 98 So.3d 934, 939, writ denied, 12-2023 (La.2/8/13), 108 So.3d 80.
Where, as in the present case, a conviction is based on circumstantial evidence, our jurisprudence reflects that “such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.” State v. McNair, 12-0064, p. 12 (La.App. 4 Cir. 12/28/12), 107 So.3d 806, 813, quoting Kirk, 11-1218, pp. 5-6, 98 So.3d at 939 (internal citations omitted). We are mindful, too, “that the reviewing court is not called upon to decide whether it believes the witnesses or |7whether the conviction is contrary to the weight of the evidence.” State v. Williams, 11-1547, p. 4 (La.App. 4 Cir. 9/26/12), 101 So.3d 104, 108, writ denied, 12-2252 (La.4/1/13), 110 So.3d 575, citing State v. Mussall, 523 So.2d 1305 (La.1988). Accordingly, the appellate court may not disturb the trier of fact’s determination of credibility on appeal absent an abuse of discretion. Id. See also, Williams, 11-1547, p. 4, 101 So.3d at 108, citing State v. Cashen, 544 So.2d 1268 (La.App. 4th Cir.1989) (“[t]he trier of fact’s determination of credibility is not to be disturbed on appeal absent an abuse of discretion”).
In this matter, the defendant was convicted of first-degree murder, which is defined as the killing of a human being “[w]hen the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is ... sixty-five years of age or older [.]” La. R.S. 14:30(A)(5). “Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact and may be inferred from the circumstances of the transaction. State v. Morgan, 12-2060, p. 5 (La.App. 1 Cir. 6/7/13), 119 So.3d 817, 822. “Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant’s actions or facts depicting the circumstances.” Id. Additionally, specific intent “may be formed in an instant.” State v. Wright, 01-0322, p. 11 (La.12/4/02), 834 So.2d 974, 984.
During the course of trial, testimony revealed that Binika Hankton was the last person to see Henry Barber alive. Ms. Hankton, who was 36 years old at the ^time of the murder, testified she had known Barber since she was 17 years old, *405 and had purchased drags from him over the years. She continued to have a relationship with Mr. Barber after his release from prison in 2005, and she described her role as that of a caretaker, which included her cleaning, cooking and running errands for him, and having sexual relations with him. Ms. Hankton acknowledged that she was paid by Mr. Barber.
On the date of Mr. Barber’s murder, Ms. Hankton left Mr. Barber’s apartment in the afternoon and thereafter made numerous attempts to contact him, both by phone and by visits to his apartment. Her efforts included a 5:30 a.m. phone call to Martha Horton, a manager/clerk of the apartment complex on September 16, and a walk around the apartment with NOPD Officer Harris that evening. Despite what she described as attempts to check on Mr. Barber’s wellbeing, Ms. Hankton never informed the NOPD or anyone else she contacted that she had accidentally backed into Mr. Barber causing him to stab himself just before she left his apartment the prior day. She only provided this information in her second statement when confronted by detectives about smoking crack after she had last left the victim.
Thus, by her own testimony, Ms. Hank-ton placed herself in Mr. Barber’s apartment on September 15, 2009, which was during the estimated time range of his murder.[7]
| aMore importantly, the evidence at trial revealed that Mr. Barber’s closet, where he kept his valuables, had been ransacked and one of four knives in a set of knives was missing from Mr. Barber’s kitchen. When Ms. Hankton’s apartment was searched after her arrest, NOPD discovered a knife matching Mr. Barber’s missing knife.[8] Ms. Hankton’s testimony was that Mr. Barber had purchased two sets of knives and he “gave [her] like three or four of those knives.” Ms. Hankton did not identify any other knives Mr. Barber allegedly gave her.
Two of the detectives who assisted in the execution of the search warrant, Detectives Ryan Aucoin and Daniel McMul-len, testified that they confiscated a set of knives from Ms. Hankton’s apartment and all of the knives matched, except for one. That mismatched knife, according to NOPD Officer Desmond Pratt, who also assisted in the execution of the search warrant, was a “direct match” of the knife missing from Mr. Barber’s set. According to Dr. McGarry, who performed the autopsy, the knife found in the Ms. Hankton’s residence, which matched Mr. Barber’s set, was compatible with the type of weapon used to stab Mr. Barber.[9]
The jury also heard testimony from which it could deduce that the knife found in Ms. Hankton’s apartment was used in Mr. Barber’s murder. When Ms. Hank- *406 ton’s aunt, Theresa Keller testified, she denied that either she or Ms. Hankton’s grandmother (Ms. Keller’s mother) received any phone calls from Ms. Hankton while Ms. Hankton was in prison. However, the State played a recording |]0of an October 14, 2009 telephone call initiated by Ms. Hankton to her grandmother during which Ms. Hankton is heard to state, “[l]et them know that those are the knives that have been in the house.” Ms. Keller then admits her voice in the background stating to her mother, “I ain’t — you don’t have to remember nothing” and “I’m not lying for anybody. Ms. Keller then identifies Ms. Hankton’s voice stating, [t]ell Theresa to shut up.”
Other evidence discovered by Detectives Aucoin and McMullen when they searched Ms. Hankton’s apartment included Mr. Barber’s savings and withdrawal book and his I.D. card under the mattress of Ms. Hankton’s bed. Ms. Hankton’s explanation for her possession of Mr. Barber’s identification card was that it had fallen out of his pocket into her car about a month before his death and when she located it, he asked her to “just hold it until [he] need[s] it again.” She also explained that she “was always writing out his withdrawal slips,” and he would call her “to come on over here ... to get [him] to get the money out of the bank.” When asked why she kept the bank book under the mattress, she testified that it was important and that it “shouldn’t be just sitting out.”
The State also introduced writings obtained from Mr. Barber’s apartment, which revealed that he had previously accused Ms. Hankton of stealing from him and that he was considering reporting her for taking drugs while on probation. Writings from Ms. Hankton to Mr. Barber revealed that she was unhappy with Mr. Barber’s treatment of her including humiliating sexual acts that he sought from her.
During the course of her trial testimony, Ms. Hankton’s version of what transpired before she left Mr. Barber’s apartment on September 15, 2009, was inconsistent with her prior videotaped statements. In response to the State’s |! T questioning, Ms. Hankton recounted that, after she and Mr. Barber had eaten the meal she prepared, Mr. Barber went to the bathroom. She then took their plates to the kitchen to wash them off. As she was replacing the plates in the cabinet, she backed into Mr. Barber, unaware that he was standing behind her, “pulling his hairs out of his neck.” She then noted that he had cut himself with the sharp object he was using. In her videotaped statement, Ms. Hankton stated that she was vacuuming when she accidentally backed into Mr. Barber.
Considering “the record as a whole,” as per Huckabay and it its progeny, we find that the evidence presented at trial “could reasonably support a finding of guilt beyond a reasonable doubt.” Jackson, 443 U.S. at 318, 99 S.Ct. at 2788. The jury considered critical evidence tending to prove Ms. Hankton’s guilt: the knife missing from Mr. Barber’s apartment and matching his set of knives (all of which were together in what appears to be their original packaging) was found in Ms. Hankton’s apartment; the telephone call between Ms. Hankton and her grandmother in which Ms. Hankton suggests that the latter advise the authorities that the knife had been in the apartment; her suspicious behavior following Mr. Barber’s murder (including the 5:30 a.m. telephone call on September 16, 2009 to Ms. Horton, the apartment complex manager/clerk); Ms. Hankton’s varying versions of what occurred the afternoon of September 15, 2009; Mr. Barber’s ID card and his savings passbook were discovered under the *407 mattress of Ms. Hankton’s bed; Ms. Hankton’s failure to be forthcoming with the police officers during the initial stages of the investigation until she decided to “tell ... the truth;” and the notes handwritten by Ms. Hankton in which she detailed her frustration [12with Mr. Barber’s treatment of her (including his wanting sexual acts from her she was no longer willing to perform).
It is the jury’s province to weigh the evidence and the credibility of the witnesses and its finding will not be disturbed absent an abuse of discretion. State v. Barnes, 11-1421 (LaApp. 4 Cir.9/19/12), 100 So.3d 926. We find no abuse of the jury’s discretion and accordingly find no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 1:
In her first assignment of error, Ms. Hankton contends that the trial court erred by failing to grant her motion to suppress. She argues that her statement was unconstitutionally obtained during her “custodial interrogation” by the police while she was under significant restraint, citing Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) as support.
We find that the record supports the trial court’s refusal to grant the motion to suppress.
The Fourth Amendment to the United States Constitution and Article I, 5 of the Louisiana Constitution protect persons against unreasonable searches and seizures. A defendant adversely affected may move to suppress any statement from use at the trial on the merits on the ground that it was unconstitutionally obtained’. La. C.Cr.P. art. 703 A. A trial court’s ruling on a motion to suppress the evidence is entitled to great weight, considering the district court’s opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Robinson, 09-1269, p. 5 (La.App. 4 Cir. 5/12/10), 38 So.3d 1138, 1141, citing State v. Mims, 98-2572, p. 3 (La.App. 4 Cir. 9/22/99), 752 So.2d 192, 193-94.
| isThe obligation to provide Miranda warnings attaches only when a person is questioned by law enforcement after he has been taken “into custody or otherwise deprived of his freedom of action in any significant way.” Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612 (1966). Custody is decided by two distinct inquiries: an objective assessment of the circumstances surrounding the interrogation to determine whether there is a formal arrest or restraint on freedom of the degree associated with formal arrest; and, second, an evaluation of how a reasonable person in the position of the interviewee would gauge the breadth of his freedom of action. Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994), (citing California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)(per curiam)); State v. Manning, 03-1982, p. 24 (La.10/19/04), 885 So.2d 1044, 1074 (citations omitted).
When a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state shall be required, prior to presenting the confession or statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement. State v. Montejo, 06-1807 (La.5/11/10), 40 So.3d 952, 966. Likewise, the testimony of the interviewing police officer alone may be sufficient to prove that a defendant’s statement was given freely and voluntarily. La.C.Cr.P. art. 703.
*408 In the instant matter, Detective Desmond Pratt testified that he first encountered Ms. Hankton at police headquarters on September 17, 2009. She had voluntarily come to the station to assist Detective Hamilton in the investigation of Mr. Barber’s murder. Detective Pratt explained that on that day, over the course of 114ten or twelve hours, Ms. Hankton gave three statements — the first two of which were not recorded, while the third one was.[10] Detective Pratt stated that during the first and second statements, Ms. Hank-ton was not a suspect,[11] and she was free to leave at any time. However, prior to making the third statement, Ms. Hankton was Mirandized, signed the waiver of rights form and proceeded to retell her story.
Detective Pratt recalled that during her initial statement, Ms. Hankton said she was the victim’s caretaker. She outlined her activities from September 15 through September 17, 2009, but she did not mention that she caused the victim to stab himself in the neck.
When the detectives returned to interview Ms. Hankton, Detective Pratt noted that Ms. Hankton reported having last seen Mr. Barber alive on September 15, 2009. She left Mr. Barber’s apartment that day by cab and went to Sherman Gillum’s residence. Mr. Gillum then drove her to purchase cocaine, which they smoked at his residence. After the pair had sex, Sherman drove her home to Algiers.
According to Detective Pratt, Ms. Hank-ton then stated, [t]hat’s it. I’m going to tell you the truth. She then told the detectives that on September 15, 2009, while she was vacuuming Mr. Barber’s apartment, she backed into Mr. Barber, causing him to stab his throat with a sharp metal object. When she said she saw blood dripping from Mr. Barber, Detective Hamilton stopped the l1Bconversation and read Ms. Hankton her Miranda rights.[12] He turned on the recording system, and Ms. Hankton repeated that she had backed into Mr. Barber and he cut his neck. Mr. Barber then stated that he was okay, and he went to lie down. Ms. Hankton left Mr. Barber’s apartment after obtaining a $10.00 cab fare from him.
Detective Greg Hamilton testified that he first spoke with Ms. Hankton by telephone on September 17, 2009, after learning that Ms. Hankton had reported concerns for Mr. Barber to his neighbors and to the NOPD. At that time, she agreed to assist in the investigation. Because Ms. Hankton had no means of transportation, *409 Detective Hamilton dispatched a police unit to transport her and her two young children to police headquarters.
Detective Hamilton recalled that in his initial conversation[13] with Ms. Hankton at headquarters, she said she did not know what happened to Mr. Barber. All she said was that she was worried about him because she had not seen or spoken with him since September 15, 2009, the last day she saw him alive. Detective Hamilton specifically remembered that Ms. Hankton did not say anything about the victim accidentally stabbing himself in the neck or her having smoked crack that day. After Ms. Hankton mentioned her boyfriend, Thurman 11fi Johnson, during the interview, Detective Hamilton obtained a recorded taped statement from him while Ms. Hank-ton was at the station. Mr. Johnson related to Detective Hamilton that Ms. Hank-ton told him that Mr. Barber had cut his throat when she backed into him on September 15, 2009. Mr. Johnson also said he asked Ms. Hankton if she had called an ambulance for the victim.
Having received this information from Mr. Johnson, Detective Hamilton initiated a second conversation with Ms. Hankton in which she told him that Mr. Barber had cut his throat when she bumped into him. Hamilton ceased the questioning and Mir-andized Ms. Hankton, who signed a waiver of rights form. Hamilton then began video recording her statement, discussed in detail above.
The defendant cites Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643(2004) as support for her argument. However, the circumstances presented in this case are distinguishable from Seibert. In Seibert, officers questioned a female murder suspect in a two-stage interview. In the first interview, the officer purposely failed to give the defendant Miranda warnings. The officer questioned Seibert for thirty to forty minutes and obtained a confession. After a twenty minute break, the officer returned and advised Seibert of her rights under Miranda. A signed waiver of rights was obtained, and the officer resumed questioning, confronting Seibert with her pre-warning confession. By use of this interrogation protocol, the officer obtained a post-warning confession which basically repeated Seibert’s earlier statement. Seibert moved to suppress both her pre-warning and post-warning' statements. The trial court in that case suppressed the pre-warning statement only, admitting Seibert’s post-warning statement at trial.
h7The United States Supreme Court held that both the pre-warning and post-warning statements were inadmissible at trial. Seibert, 542 U.S. at 617, 124 S.Ct. at 2613. The Supreme Court found that a midstream recitation of Miranda warnings could not comply with the object of Miranda, i.e., that the “warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture.” Seibert, 542 U.S. at 612, 124 S.Ct. at 2610. As the Court stated:
Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.
Seibert, 542 U.S. at 613, 124 S.Ct. at 2611.
In this case, unlike in Seibert, Ms. Hankton was not a suspect at the time she *410 initially spoke with Detective Hamilton. As she was the first person to report concerns for Mr. Barber, Detective Hamilton characterized it as an “interview.” The evidence shows that she was given her Miranda rights, and that she voluntarily signed the waiver of rights form once she became a suspect. Moreover, Ms. Hank-ton was not arrested after she gave her videotaped statement. Detective Hamilton testified that he did not have sufficient evidence, and, in fact, the coroner had not yet declared Mr. Barber’s death a homicide at that time. Likewise, the police did not arrest her even after executing a search warrant at her apartment and finding Mr. Barber’s personal effects and a knife matching the one suspected of being the murder weapon.[14]
Ms. Hankton did not testify that she felt restrained in any manner, nor did she say that she gave the statement under duress. She readily agreed to talk to the hspolice in her effort to assist with the investigation in any way possible. We find that Ms. Hankton was not in custody at the time that she made the statement and we find that it was freely and voluntarily made.
More importantly, we do not find the statement Ms. Hankton made during her interview with Detectives Hamilton and Pratt to be either inculpatory or exculpatory, thereby requiring that she first be given her Miranda rights. She neither confessed to Mr. Barber’s murder nor stated that she had stabbed him. As such, the statement in no way implicated her in Mr. Barber’s death.
As the Louisiana Supreme Court recognized in State v. Payne, 01-3196, p. 9 (La.12/4/02), 833 So.2d 927, 935, “[t]he Miranda right to counsel is a prophylactic rule that does not operate independent from the danger it seeks to protect against, i.e., the compelling atmosphere inherent in the process of in-custody interrogation, and the effect that danger can have on a suspect’s privilege to avoid compelled self-incrimination.” See also State v. Taylor, 01-1638, p. 6 (La.1/14/03), 838 So.2d 729, 739 (Miranda “protects an individual’s Fifth Amendment privilege during incommunicado interrogation in a police-controlled atmosphere. The privilege guards against compelled self-incrimination and prevents a criminal defendant from being made ‘the deluded instrument of his own conviction,’ ” quoting Culombe v. Connecticut, 367 U.S. 568, 581, 81 S.Ct. 1860, 6 L.Ed.2d 1037, (1961)). In ensuring that a defendant’s rights are thus protected, a well-established body of law has developed indicating that “the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the 119defendant[15] unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.” State v. Marshall, 12-0650, p. 2 (La.App. 4 Cir. 7/31/13), 120 So.3d 922, 925 (emphasis added), quoting Miranda, supra (1966). See also State v. Green, 443 So.2d 531, 535 (La.1983) (“[b]efore a confession or inculpatory statement can be introduced into evidence, the state has the burden of proving affirmatively, beyond a reasonable doubt, that it was free and voluntary, and not made under the influence of fear, duress, menaces, threats, inducements, or promises”) (citations omitted, emphasis added).
*411 A defendant’s statement, therefore, must first qualify as “inculpatory” or “exculpatory” before its use may even be considered to be afforded .protection under Miranda and its progeny. In State v. Hill, 98-1087 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, the Fifth Circuit considered several statements made by a juvenile defendant regarding the circumstances of the shooting death of a minister, which the defendant sought to suppress. In two of the statements, the defendant implicated .two other' persons in the shooting. He argued that, while those statements were not “inculpatory per se,” they were “used prejudicially along with the second and third statements to prove him a liar.” Id., 98-1087, p. 8, 742 So.2d at 696. Finding no error in the trial court’s denial of the defendant’s motion to suppress, the court stated:
As [the defendant] points out, the first statement was not inculpatory; in fact, he aimed suspicion at two others. Police officers going through a neighborhood following a serious crime are not obligated to read Miranda rights to potential or even actual witnesses. Only when a person becomes a suspect does the police obligation change.
19Jd. (emphasis added).
Here, Ms. Hankton’s statement neither implicated her in, nor exculpated her from, Mr. Barber’s murder. Rather, it simply placed Ms. Hankton at Mr. Barber’s apartment on September 15, 2009, a fact she had already related to Detectives Hamilton and Pratt. Accordingly, because the statement was neither inculpatory nor exculpatory, the officers were under no obligation to give Ms. Hankton Miranda rights.
 Furthermore, we find that even if Ms. Hankton’s statement had been inculpatory and improperly admitted, her own testimony at trial (giving largely the same account of the events of September 15, 2009) renders the admission of her statement harmless error.[16] In State v. Tate, 98-117 (La.App. 5 Cir. 5/27/98), 714 So.2d 252, for example, the defendant was charged with obtaining a controlled dangerous substance by fraud or deceit. When he was questioned about the prescription medication shortly after he received it from a pharmacy, the defendant provided the name of a person to whom the prescription had been written (the deceased mother of his friend). At trial, the defendant testified that he had called for a refill of the prescription at the request of his friend whose nerves were “bad.” After first determining that the defendant had not been in custody when he gave the initial statement, the court noted:
Even [if] we were to find' that the defendant’s inculpatory statement was improperly admitted at trial, which we do not, such an admission is subject to harmless error analysis. Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991); State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, cert. denied, Tart v. Louisiana, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). We find that the other | ⅞1 testimony elicited at trial would render this admission harmless error.
Id., 98-117, p. 10, 714 So.2d at 256.
Accordingly, while we have already concluded that Ms. Hankton’s statement was not one that required a prior Miranda warning, we further find that Ms. Hank-ton’s testimony at trial negated the effect *412 of any possibly improper admission of her statement.
We find no error in the trial court’s denial of the motion to suppress and find no merit to this assignment of error. ASSIGNMENT OF ERROR NO. 2:
In a second assignment of error, Ms. Hankton complains that she has been denied her right to adequate appellate review because the videotape of her statement could not be located in the NOPD evidence room. After the record was lodged with this Court, we issued an order to the trial court and to the State, instructing them to produce a copy of the recording if either had one in its possession. The State produced a copy, and this Court then allowed appellate counsel the opportunity to view the tape. Defense counsel objected to the use of the tape because it could not be authenticated. This Court then issued an order to the Clerk of Criminal District Court that it produce certain missing evidence, including the videotape introduced at trial.
On March 24, 2014, in compliance with this Court’s order, the Clerk of Criminal District Court filed the additional evidence into the record, including the original videotaped statement of Ms. Hankton dated September 18, 2009 and | ^marked as State’s Exhibit “6” and Defense Exhibit “D65.” We therefor consider this assignment of error to be moot.[17]
ASSIGNMENT OF ERROR NO. 3:
In this assignment of error, Ms. Hank-ton maintains that the trial court erred when it limited defense counsel’s voir dire and thus impeded the defense’s ability to provide a foundation for a change of venue. She argues that her counsel should have been able to fully explore the impact that her last name (being the same as that of her cousin, a well-publicized convicted felon, Telly Hankton) had on the potential jurors.
The appellate record indicates that the trial judge denied the change of venue request at a motion hearing held on August 26, 2011, finding it premature. The judge also noted that if, during jury selection, a change of venue was warranted, the issue could be decided then. Defense counsel objected. He did not re-urge the motion for change of venue.
Because counsel for Ms. Hankton did not re-urge the motion for change of venue, the issue is not properly before this Court. Trial courts routinely defer ruling on motions for a change of venue until after voir dire. In the oft-cited case of State v. Goodson, 412 So.2d 1077, 1081 (La.1982), the Supreme Court vacated a trial court’s denial of a motion to change venue and “directed [the trial court] to defer ruling on the motion until completion of voir dire.” The Court noted that “[a]s there has not yet been a voir dire examination, it is impossible to decide at this point whether actual prejudice against the accused exists on the part of prospective jurors.” Id., 412 So.2d at 1080. See also State v. Smith, (La.1987), [23504 So.2d 68 (Lemmon, J., concurring)(“[w]hen the trial judge refuses to change venue, the defendant has the right to reurge the motion during or upon completion of voir dire at trial if the answers of the prospective jurors indicate that the defendant cannot receive a fair trial in that parish”).
While the trial court did not defer ruling on the motion in this matter, the court expressly indicated that “should [venue] become an issue that ... need[s] to be *413 address[ed], [the court] would be happy to reconsider it.” The trial court’s reasoning echoes that of the Goodson court; the trial court, finding the motion to be premature, stated: “I do find that granting it (the motion to change venue) now, before we even know what the jury members are going to say, is premature.” We see no difference in the trial court’s ruling (essentially inviting the parties to re-urge the motion after voir dire) and a court’s deferring a ruling on a motion to change venue prior to trial.
Our jurisprudence reflects that, when a trial court defers ruling on a motion to change venue and the motion is not re-urged after voir dire, the issue is not preserved for appellate review. See State v. Bourque, 93-594 (La.App. 3 Cir. 2/16/94), 636 So.2d 254, 262 (“[n]ot only has the defendant precluded appellate review of this issue by non-compliance with LSA — C.Cr.P. art. 621, but he has also done so by his failure to re-urge his motion during or after voir dire”); State v. Brogdon, 426 So.2d 158 (La.1983), (“[i]t would be manifestly unfair to allow the defendant to remain mute on the matter at trial and then to urge on appeal improper denial of his motion once the jury returned a verdict which was unfavorable to him”). See also State v. Hess, 625 So.2d 276, 279 (La.App. 4 Cir.1993)(where the pro se defendant filed a motion for a change of venue that was never acted on by l^the trial court, this Court held that “[b]ecause neither [t]he defendant nor his counsel objected to the failure of the trial court to rule on [his] pro se motion for a change in venue, they cannot now claim the benefit of that irregularity. If it were otherwise, a defendant could chance a favorable verdict, and if unsuccessful, then raise the question of the irregularity”).
Accordingly, we need not address whether the trial court improperly denied Ms. Hankton’s request for a change of venue.
We now turn to the issue of whether the trial court improperly limited Ms. Hankton’s counsel’s voir dire to the extent that it deprived her of her constitutional right to a fair trial. Her argument is based on her claim that her counsel was not allowed to “adequately explore the jury’s knowledge of, and feelings about, Telly Hankton as they related to [her].”
There is no question that “[a] defendant is constitutionally guaranteed an impartial jury and a fair trial.” La. Const, art. 1, § 16. Nor is there any question that a defendant “shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily.” La. Const, art. 1, § 17(A).
The standard for appellate review of claims that voir dire was unlawfully limited was reiterated by the Louisiana Supreme Court in State v. Holmes, 06-2988, p. 55 (La.12/2/08), 5 So.3d 42, 79-80:
La. Const, art. I, § 17 guarantees a defendant full voir dire examination of prospective jurors and the right to challenge jurors peremptorily. The purpose of voir dire is to determine qualifications of prospective jurors by testing their competency and impartiality in order to discover bases for challenges for cause and for the intelligent exercise of peremptory challenges. State v. Hall, 616 So.2d 664, 668 (La.1993). Nonetheless, the scope of examination rests within the sound discretion of the trial court, and its ruling will not be disturbed absent ladear abuse. La.Code Crim. Proc. art. 786; Hall, 616 So.2d at 669. In determining whether the trial court afforded a sufficiently wide latitude to the defendant, the entire voir dire examination must be considered.
*414 This Court has also indicated that a court may limit voir dire “as long as the limitation is not so restrictive as to deprive defense counsel of a reasonable opportunity to probe to determine a basis for challenge for cause and for the intelligent exercise of peremptory challenges.” State v. Anear, 508 So.2d 943, 948 (La.App. 4th Cir.1987).
In this matter, during voir dire, defense counsel asked whether anyone had heard of Telly Hankton in the news, and twenty-six panel members raised their hands. Each of the twenty-six was questioned individually, out of the hearing of the rest of the panel members. Few of the potential jurors had any knowledge of the crime, and of those few, their knowledge was limited to hearing “something about the case.” Ms. Hankton does not point to any unrelated events that reflected the attitude of the community of jurors towards her.
The first of the twenty-six potential jurors explained that he had read in the newspaper about the hung jury in the Telly Hankton murder trial. Defense counsel then asked, “Do you know anybody that works in journalism ... ?” The trial judge advised defense counsel that he was to pose questions to the panel members “strictly in regards to the Hankton name, that is it.”
Defense counsel then questioned another panel member, “And considering that there will likely be press about this case ...” The judge once again informed defense counsel:
| gf;“I’m not going to allow you to ask those questions. Ask any questions about the Hankton name. Other questions you may ask in front of the rest of the jury.”
When defense counsel began questioning the third of the twenty-six panel members with knowledge of the Hankton name, the trial judge advised all counsel that she was taking over the questioning. For the next seven panel members that the trial judge questioned individually, one said her family had connections to the Hankton family, and the other six said that they had heard the Hankton name, though not specifically Ms. Hankton’s name in the media. The judge also asked each of the seven if he/ she had a preconceived notion about Ms. Hankton’s guilt or innocence, to which each replied that he/she did not. In addition, the judge asked each potential juror whether he/she could be a fair and impartial juror in this case. Only four of the seven said yes.[18]
As concerns the nature of the pretrial publicity, and the degree to which it was circulated in the community, voir dire revealed that twenty-six of the seventy-five potential jurors (35%) were at least vaguely familiar with the Hankton name, though not Binika Hankton, through media accounts, neighborhood contact and/or conversation. However, the record also reveals that the trial court excused ten of the twenty-six jurors for cause (38%) who said they could not be impartial because of pretrial publicity or because they were acquainted with Ms. Hankton’s family. Thirteen percent of the prospective jurors in this case were excused because of either their connection with the Hankton family, or because they had a preconceived notion as to the defendant’s guilt, or feared serving on the jury.
| j,,7In this case, media coverage was primarily factual in nature and the record showed that each prospective juror was questioned individually concerning his/her *415 knowledge of the instant case and opinions concerning Ms. Hankton’s guilt or innocence. A review of the responses of the potential jurors on voir dire does not reveal the existence of collective community prejudice which could have denied defendant a fair trial before impartial jurors. Likewise, Ms. Hankton’s claim that her family name affected the potential jurors’ responses during voir dire is nothing more than speculation.
The record indicates that voir dire was long and thorough enough to gauge the panel members’ knowledge of the case and of Ms. Hankton and her family. In addition to the judge’s questioning, defense counsel and the prosecutor also questioned potential jurors on media influence. The defendant has not shown that she suffered any prejudice because of “limited” voir dire.
Moreover, those prospective jurors who indicated some knowledge of this case through pretrial publicity were questioned individually and extensively regarding that knowledge and their ability to be fair and impartial. The jurors who knew the defendant’s family or said they had preconceived opinions of defendant’s guilt/innocence and could not be fair and impartial were excused from the jury.[19]
This Court is to reverse a trial court’s exercise of discretion “upon review of the voir dire examination as a whole,” only when that exercise of discretion “has | gsbeen arbitrary or unreasonable, resulting in prejudice to the defendant.” State v. Kirk, 11-1218, p. 10 (La.App. 4 Cir. 8/8/12), 98 So.3d 934, 941 (Citations omitted). Ms. Hankton has not articulated any factual basis for her argument that she was prejudiced by the scope of voir dire in this matter. Nor do we find any abuse in the trial court’s handling of voir dire. We, therefore, find no merit to this assignment of error.
CONCLUSION:
After a thorough review of the record in this case, we affirm Ms. Hankton’s conviction and sentence.
AFFIRMED.
JENKINS, J., Dissents with reasons.

. The defendant sought a supervisory writ of review of the trial court’s denial of the motions to suppress which this Court denied. State v. Hankton, 10-924 (La.App. 4 Cir. 7/16/10), unpub. A writ to the Supreme Court was also denied. State v. Hankton, 10-1797 (La.8/5/10), 42 So.3d 379.

. Ms. Hankton also had a personal relationship with the victim.

. NOPD officers were already at the scene and had located Mr. Barber’s body.

.These inconsistencies related to Ms. Hank-ton's activities on the September 15, 2009 that she had not related to them, including that she had gone with a male friend, Sherman Gillum, to buy some crack cocaine.

. The videotape was played for the jury at trial.

. As is the practice of this Court, we conducted an errors patent review of the record and found no errors patent.

.Ms. Hankton testified that she left Mr. Barber’s apartment to meet at the apartment of Sherman Gillum around 5:30 p.m., after having spent the day with Mr. Barber (Mr. Gil-lum confirmed that Ms. Hankton was waiting at his apartment when he arrived at 5:30 p.m.). Dr. Paul McCarty, the forensic pathologist who performed Mr. Barber’s autopsy on September 17, 2009, placed the time of Mr. Barber’s death at between "more than one and a little less than two days" before the autopsy (i.e. more than 24 but less than 48 hours). Similarly, another witness, Narokia "Ricky” Butler, with whom Ms. Hankton has a child, testified that he saw Ms. Hankton and Mr. Barber leave Mr. Barber's apartment and return around 3:00 p.m. on September 15, 2009.

. Ms. Hankton resided with her grandmother and accordingly, the knife was found at her grandmother’s house.

. Dr. McGarry also testified that while Mr. Barber had been stabbed 21 times, none of the wounds could have been caused by tweezers or a shaving implement.

. While Detective Pratt noted three interviews with Ms. Hankton, our review of the record reflects that there were actually two interviews, the second of which was interrupted so that Ms. Hankton could be given Miranda warnings.

. The coroner’s office had not yet classified Mr. Barber’s death as a homicide. It was not until the completion of the autopsy the following day that his death was classified as a homicide.

. We note that Detective Pratt’s testimony differs from that of Detective Hamilton in a couple of respects. First, Detective Pratt indicated that Ms. Hankton reported having seen Mr. Gillum with whom she smoked crack cocaine prior to being Mirandized (according to Detective Hamilton, she relayed this information afterwards). Likewise, Detective Hamilton indicated that Ms. Hankton reported the incident in which Mr. Barber was accidentally cut when she backed into him prior to being given her Miranda rights (whereas Detective Pratt recalled that information being provided after the Miranda warning). This discrepancy is of no consequence to our ultimate findings, as we conclude that none of the statements made by Ms. Hankton, either before or after she was Mirandized, were inculpatory in nature (or, for that matter, exculpatory).

. Detective Desmond Pratt was with Detective Hamilton during the initial interviews with Ms. Hankton. However, Detective Michael McCleery was present only when the defendant gave her recorded statement.

. Ms. Hankton was initially arrested a for probation violation because of her admission to Detective Hamilton that she had smoked crack on the last day she saw the victim.

. Again, as previously discussed, we do not find that the interview with Ms. Hankton was a "custodial interrogation” as contemplated by Miranda.

. The erroneous admission of a confession or a statement is a trial error, which is subject to a harmless error analysis. State v. Monte-jo, 06-1807, p. 33 (La.5/11/10), 40 So.3d 952, 975.

. We note, too, that Ms. Hankton's appeal counsel has not demonstrated that her lack of access to the original videotape prejudiced Ms. Hankton in any specific manner in preparing her appellate brief.

. The three panel members who replied no to the question about being a fair and impartial juror were excused for cause.

. Defense counsel could not have been overly concerned about the jury knowing that the defendant was a member of the Hankton family. In opening statement, counsel stated, "[Mr. Myers] knew [the defendant’s] family ... [he] grew up with the Hankton family, the Telly Hankton side ...” and again referred to the Hankton family on cross-examination of Mr. Myers: "And you didn’t find out or make the connection to the Hankton family when you first met [the defendant].