| STATE OF LOUISIANA | * | NO. 2025-K-0186 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| KELVIN ATKINS | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

ON SUPERVISORY WRIT FROM THE
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 560-698, SECTION "A"
Honorable Calvin Johnson, Judge
\* \* \* \* \* \*
**Judge Karen K. Herman**
\* \* \* \* \* \*

(Court composed of Judge Rosemary Ledet, Judge Paula A. Brown, Judge Karen
K. Herman)

JASON R. WILLIAMS
District Attorney
Parish of Orleans
BRAD SCOTT
Assistant District Attorney
619 South White Street
New Orleans, LA 70119

    COUNSEL FOR RELATOR, THE STATE OF LOUISIANA

JESSICA F. HAWKINS
PO Box 5072
Baton Rouge, LA 70802

    COUNSEL FOR RESPONDENT, KELVIN ATKINS

**WRIT GRANTED AND REVERSED**
**MAY 21, 2025**

Relator, the State of Louisiana ("the State"), seeks supervisory review of the trial court's March 14, 2025 ruling, which partially granted the motion to suppress statements filed by Defendant, Kelvin Atkins. For the following reasons, we grant the writ application and reverse the trial court's granting of the motion to suppress in part.

**STATEMENT OF THE CASE**

On January 26, 2024, the State filed an indictment charging Defendant, Kelvin Atkins, with multiple offenses, including the domestic abuse battery and second degree murder of Johnshane Powell, as well as several counts of felon in possession of a firearm, several counts of theft (including two counts of theft of a firearm), obstruction of justice, and violation of a protective order, violations of La. R.S. 14:35.3, 14:30.1, 14:95.1, 14:67(B)(4), 14:67.15, 14:130.1, and 14:79(C)(1), respectively.

Defendant appeared for arraignment on February 6, 2024 and entered pleas of not guilty.

On March 14, 2025, the trial court[1] held a hearing on a motion to suppress statement, wherein it denied the motion in part and granted the motion in part.[2] Specifically, the trial court denied the motion to suppress with regard to statements made by Defendant "while in custody at the First District" and the statements Defendant made "pre-*Miranda* until he is made to sit down." The trial court, however, granted the motion to suppress with respect to statements Defendant made "after [Defendant] is told to sit down on the steps."[3]

The State thereafter timely filed writs in this Court.

**STATEMENT OF THE FACTS**

*Testimony and Evidence*

NOPD Homicide Detective Tanisha Sykes-Smith testified that she was assigned as the lead investigator in this case and that she conducted an audio and video recorded interview of Defendant on July 6, 2023 in connection with the homicide of Johnshane Powell after issuing *Miranda* warnings.[4]

NOPD Officer Dominique Marie Lawrence ("Off. Lawrence") testified that five days earlier, on July 1, 2023, she responded "to a call for a domestic incident," that involved Defendant. She testified that she was wearing a body camera at the

---

[1] Judge Calvin Johnson presided over the hearing. Judge Johnson was appointed by the Supreme Court ad hoc as all of the judges in the criminal district court recused themselves due to a familial relationship between the victim and a sitting judge.

[2] The docket master does not reflect that the defense actually filed a motion to suppress. However, the record reflects a hearing and ruling on the motion. Moreover, the State does not complain in its writ application that the trial court erred in holding a suppression hearing.

[3] The State notes in its writ that the trial court granted the motion to suppress statements occurring after 1:50:40 a.m. on July 1, 2023, but denied it with respect to statements that occurred prior to 1:50.40 a.m. and those made during Defendant's interrogation on July 6, 2023.

[4] The State introduced Defendant's recorded interview and played it for the court. However, the admissibility of these statements is not at issue in this case and the exhibit was not included with the instant writ application.

2

time which captured the events at the scene. The State introduced the body camera footage and played it for the court.

The video depicts Off. Lawrence's arrival at the scene, and the victim reporting that Defendant stole her purse, which contained her car keys, credit cards, and firearm. The victim also reported that Defendant had fled the scene with his cousin in a vehicle. Defendant approached the scene shortly thereafter and explained that the victim was his girlfriend and they were just "fussing" with each other. Off. Lawrence asked Defendant if he possessed the victim's firearm, which he denied, and Defendant and the victim began arguing with each other. The victim stated that Defendant had beaten her, bit her leg, and pulled her hair, and that she wanted to "press charges." Off. Lawrence then asked Defendant for his side of the story. He denied injuring the victim, but he admitted that he had taken the victim's purse because she refused to return some of his belongings. Defendant continued arguing with the victim despite the officer's requests that he leave her alone. The video then reflects Off. Lawrence asking Defendant what he had done with the victim's firearm. He denied having the gun. Off. Lawrence then continued to interview the victim and Defendant can be seen in the background pacing up and down the sidewalk speaking on his phone, occasionally walking past the victim and continuing to engage with her.

Officer Droemann ("Off. Droemann") arrived at the scene a few minutes later. Off. Lawrence directed Off. Droemann to tell Defendant, who was still walking up and down the sidewalk on the phone, sit down or "stay down here."

Sergeant Patrick ("Sgt. Patrick"), who Off. Lawrence called to the scene, arrived later. Off. Lawrence explained to Sgt. Patrick that she had been unable to initiate a substantive investigation because her initial priority was locating the

firearm the victim alleged Defendant had stolen, and because Defendant and the victim would not stop "bickering" with each other.

Off. Lawrence testified that when she arrived, the scene was "chaotic" and the case was "still under investigation." She claimed that Defendant was free to leave at that point, stating, "He actually—when I first arrived to speak with the victim at the time, he jumped into a vehicle and drove away; he came back at a later time." Off. Lawrence testified that Defendant was not in custody until he was secured in handcuffs and issued *Miranda* warnings. Off. Lawrence authenticated the body camera footage taken from Off. Droemann's police-worn body camera which also recorded the events at the scene and was introduced into evidence.

A review of Off. Droemann's body camera footage reflects his arrival at the scene. The footage shows Off. Lawrence and another female officer asking Defendant on several occasions to stay away from the victim. Defendant continued to walk up and down the sidewalk while speaking on the phone. Off. Droemann then told Defendant to "do [him] a favor and have a seat right here," and offered to answer any questions Defendant may have. Defendant sat on the front steps of a nearby residence and proceeded to tell Off. Droemann why he took the victim's belongings. Defendant accused the victim of stealing his phone, and Off. Droemann asked Defendant to describe the phone. Off. Droemann also asked Defendant what he had taken from the victim, and Defendant responded that he had already returned the items.

Sgt. Patrick then approached Defendant on the porch steps and asked, "What's going on tonight?" Defendant essentially repeated the information he gave to Off. Droemann. After Sgt. Patrick went to speak to the victim down the street, Defendant asked another officer walking by if he could speak to him as well,

4

although the other officer kept walking. Defendant also called to Sgt. Patrick while he was speaking with the victim. When Sgt. Patrick returned, Defendant again related his version of events. After several minutes of discussion, Sgt. Patrick secured Defendant in handcuffs, and explained that he was being detained for the duration of the investigation. Thereafter, Off. Droemann searched Defendant's pockets and placed him in the back seat of his patrol car.

Off. Lawrence testified that once Defendant was told to sit down on the steps, he began asking Off. Droemann and Sgt. Patrick if he could speak with them. She stated once Defendant was secured in handcuffs, he was no longer free to leave.

On cross-examination, Off. Lawrence clarified that the victim had informed her that Defendant had departed the scene in a vehicle prior to the arrival of law enforcement, and upon his return to the scene, he was a suspect in the investigation. She admitted that victim had advised her that a "battery occurred" and that there was a "potential theft." However, Off. Lawrence explained that she was still conducting her investigation and Defendant was neither detained nor under arrest at that time, stating, "You have to hear both sides, and I hadn't investigated his version because he made accusations that the victim stole his property as well." Off. Lawrence stated that had Defendant "attempted to leave and I—during my investigation, I found that everything she stated was true, a warrant would have been placed for his arrest, had he left the scene."

Off. Lawrence stated that following Defendant's allegations against the victim, an officer at the scene asked Defendant to sit down to continue the discussion regarding both his and the victim's reciprocal criminal accusations.

Off. Lawrence maintained that Defendant was still free to leave at that time. She admitted that there were four officers investigating the scene.

*Argument and Trial Court's Ruling*

Following the presentation of evidence at the hearing, the State argued that Defendant was neither detained nor arrested until he was secured in handcuffs; thus, he was not in custody when he made his statements to police. The State further asserted that Defendant voluntarily and continuously initiated his conversations with the officers thus he was not subject to an interrogation. Accordingly, the State argued that the officers were not required to issue *Miranda* warnings and his statements should not be suppressed.

Defendant argued, however, that because he was a suspect in the investigation even prior to his return to the scene, any statements he made to the officers at the scene, even in response to Off. Lawrence's questions regarding the location of the victim's firearm, should be suppressed in the absence of *Miranda* warnings. Defendant further argued that once Sgt. Patrick approached his location on the front steps of the residence where Defendant was conversing with Off. Droemann, he was, at that moment, "surrounded by more than one officer," and "would not have believed that he was free to leave at that time;" thus, his statements to Sgt. Patrick should be suppressed.

The trial court thereafter ruled as follows:

> As regards [to] the statements made while he was in custody at the First District, those statements are admissible simply because he was informed of his rights and he waived those rights.
>
> As regards to [the] statements he made pre-*Miranda* until he is made to sit down, he was free to leave. He was absolutely free to leave. In fact, he left and came back and he left and came back. I see you shaking

your head Mr. Atkins. He left and came back. He walked away. He walked away. He came back. He walked away. He came back. Obviously, he was free to leave. The only point in this whole conversation when he arguably wasn't free to leave is when he was told to sit down on the steps. Now, whatever he said after he's told to sit down on the steps, this court is going to suppress. Everything else he said, however, is admissible.

## DISCUSSION

In its writ application, the State argues that the trial court erred in suppressing the statements Defendant made after Off. Droemann asked him to sit down, on the grounds that Defendant "arguably wasn't free to leave." The State asserts that "whether someone is free to leave" is the "incorrect standard" to determine whether *Miranda* warnings are required. The State argues that the evidence presented in the instant case did not demonstrate that Defendant was subjected to "custodial interrogation triggering the need for *Miranda* warnings," as he had not been subjected to any "significant restraint associated with formal arrest."

When a trial court finds facts based on the weight and credibility of witnesses' testimony, a reviewing court may not overturn those findings unless there is no evidence to support them. *State v. Wells*, 2008-2262, p. 5 (La. 7/6/10), 45 So.3d 577, 581. On the other hand, a trial court's holdings on questions of law are reviewed *de novo*. *Id.* at p. 4, 45 So.3d at 580.

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966), provides that:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean

7

questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

"*Miranda* only applies if three conditions are met: (1) the defendant is in 'custody' or significantly deprived of freedom, (2) there is an 'interrogation,' and (3) the interrogation is conducted by a 'law enforcement officer' or someone acting as their agent." *State v. Bernard*, 2009-1178, p. 5 (La. 3/16/10), 31 So.3d 1025, 1029. "Custody is decided by two distinct inquiries: an objective assessment of the circumstances surrounding the interrogation to determine whether there is a formal arrest or restraint on freedom of the degree associated with formal arrest; and, second, an evaluation of how a reasonable person in the position of the interviewee would gauge the breadth of his freedom of action." *State v. Hankton*, 2012-0466, p. 13 (La. App. 4 Cir. 4/30/14), 140 So.3d 398, 407.

To evaluate how a reasonable person in the defendant's position would "gauge the breadth of his freedom of action," courts review the totality of the circumstances surrounding the interrogation, "including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave, but ignoring the subjective views harbored by either the interrogating officers or the person being questioned." *State v. Robertson*, 2017-0398 p. 3 (La. App. 4 Cir. 5/12/17), 219 So.3d 1125, 1127-28 *quoting J.D.B. v. North Carolina*, 564 U.S. 261, 271, 131 S.Ct. 2394, 2402, 180 L.Ed.2d 310 (2011)) (internal quotations omitted).

Relevant factors include the location of the questioning, *see Shatzer*, *supra*, at 130 S.Ct., at 1223–1226, its duration, *see Berkemer v. McCarty*, 468 U.S. 420, 437–438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), statements made during the interview, *see Mathiason*, *supra*, at 495, 97 S.Ct. 711; *Yarborough v.*

> *Alvarado*, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *Stansbury*, *supra*, at 325, 114 S.Ct. 1526, the presence or absence of physical restraints during the questioning, *see New York v. Quarles*, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and the release of the interviewee at the end of the questioning, *see California v. Beheler*, 463 U.S. 1121, 1122-1123, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

*Howes v. Fields*, 565 U.S. 499, 509, 132 S.Ct. 1181, 1189 (2012).

The State notes that Defendant was in public, unrestrained, using a cell phone, and had neither been searched nor surrounded by police at the time he made the statements. While the State acknowledges that Defendant may have been detained while police initiated their investigation, it cites to *State v. Barabin*, 2013-0334, p. 6 (La. App. 4 Cir. 9/11/13), 124 So.3d 1121, 1124, which recognized that "a mere detention does not trigger the need for *Miranda* warnings, and the use of handcuffs does not necessarily escalate a detention into a state of being 'in custody' for *Miranda* purposes."

La. C.Cr.P. art. 215.1(A) provides in pertinent part:

> A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.

The U.S. Supreme Court has long held that the brief detention and preliminary questioning of a suspect to determine whether a crime has been committed is not a custodial interrogation requiring the protections of *Miranda*:

> [A] policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." *United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

9

> "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *Ibid.* (quoting *Terry v. Ohio*, supra, 392 U.S., at 29, 88 S.Ct., at 1884.) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions... The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.

*Berkemer v. McCarty*, 468 U.S. 420, 439-40, 104 S.Ct. 3138, 3150 (1984); *see also State v. Shirley*, 2008-2106, p. 9 (La. 5/5/09), 10 So.3d 224, 230 (noting that "although…an individual detained in a *Terry* stop based on reasonable suspicion has had his freedom of movement curtailed in a significant way, until an arrest actually occurs, these Fourth Amendment seizures do not constitute custody for *Miranda* purposes."). Thus, a suspect's responses to public, "on-the-scene and non-custodial questioning," are admissible without *Miranda* warnings. *Shirley*, 2008-2106, p. 8 (La. 5/5/09), 10 So.3d at 229-30.

In the instant case, in addition to the circumstances mentioned by the State indicating that Defendant was not subjected to a significant restraint on his freedom, the State also notes that Defendant had been repeatedly walking past the victim to argue with her and dispute her allegations to the police, which resulted in frequent requests from the officers at the scene that he stay away from the victim. Notably, the victim was alleging that Defendant had been physically violent toward her and had just stolen her firearm, which had not yet been located.

In *New York v. Quarles*, the U.S. Supreme Court held that "concern for public safety must be paramount to adherence to the literal language of the

prophylactic rules enunciated in *Miranda*." 467 U.S. 649, 653, 104 S.Ct. 2626, 2630 (1984). The need for police officers to locate a dangerous weapon which may be accessible to children or the general public permits the officers to question a suspect as to the weapon's location to secure it without concern that the suspect's statements would be suppressed in the absence of *Miranda* warnings. *Id*. at 655-60, 104 S.Ct. at 2631-33.

Here, Off. Lawrence asked Defendant where the firearm was located numerous times. The body camera video shows Defendant lift his shirt to show Off. Lawrence that he was not concealing the victim's firearm in his waistband. Defendant also denied having a gun. However, it remained unknown whether Defendant had hidden the firearm in an accessible location nearby, or whether Defendant posed a physical threat to the victim. Indeed, the trial court acknowledged in its ruling that Defendant repeatedly "walked away" and "came back," which the officers could have considered a safety issue had Defendant returned with the weapon.

Moreover, as shown in the body camera footage, Off. Lawrence explained to Sgt. Patrick upon his arrival at the scene that she had been unable to conduct a substantive investigation due to her concern about locating the gun and Defendant and victim's consistent arguing. In fact, moments before Off. Droemann asked Defendant to sit down on the steps, Off. Lawrence had again asked Defendant about the location of the firearm to no avail, and had again instructed Defendant to stay away from the victim. The video footage reflected that during that time, Defendant was pacing up and down the sidewalk past the victim, and would continue to engage with the victim, sparking an argument between the parties. After ignoring multiple requests from the officers to stay away from the victim,

11

Off. Lawrence told Off. Droemann to "tell [Defendant] to stay down here." Off. Droemann then asked Defendant to "do [him] a favor and have a seat right here." Defendant was not secured in handcuffs or physically restrained, he was not searched or surrounded by the officers and he continued to use his cell phone.

In the totality of these circumstances, it does not appear that the officers' intent in asking Defendant to have a seat was to affect an extended or significant restraint on Defendant's freedom, but to prevent him from potentially accessing a hidden firearm, as well as preventing his continued harassment of the victim. Accordingly, Defendant was separated from the victim so the investigation could continue, and for the safety of the victim and the officers at the scene. As noted above, temporary detentions that fall short of circumstances associated with a formal arrest are not considered "custody" for *Miranda* purposes, and statements made during such a temporary detention are not rendered inadmissible based on the absence of *Miranda* warnings.

Accordingly, the circumstances do not demonstrate that Defendant was subject to a custodial interrogation when he was asked to stay away from the victim's location, triggering the immediate necessity of *Miranda* warnings. Thus, the trial court erred in suppressing Defendant's statements based on its finding that Defendant "arguably wasn't free to leave" the steps of the residence upon which he was asked to sit. Therefore, we grant the State's writ application and reverse the trial court's ruling on this basis.

**DECREE**

For the above stated reasons, we grant the writ application and reverse the trial court's decision to grant Defendant's motion to suppress with regard to the statements Defendant made after he was asked to sit down.

12

**WRIT GRANTED AND REVERSED**