| | | |
|---|---|---|
| STATE OF LOUISIANA | * | NO. 2025-K-0316 |
| VERSUS | * | |
| | | COURT OF APPEAL |
| GERARD HILL | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPLICATION FOR WRITS DIRECTED TO
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 562-764, SECTION "L"
Judge Angel Harris
\* \* \* \* \* \*
**Judge Dale N. Atkins**
\* \* \* \* \* \*

(Court composed of Judge Daniel L. Dysart, Judge Rosemary Ledet, Judge Dale N. Atkins)

Jason R. Williams, District Attorney
Brad Scott, Chief of Appeals
Thomas Frederick, Assistant District Attorney
PARISH OF ORLEANS
619 S. White Street
New Orleans, LA 70119

     COUNSEL FOR RELATOR, the State of Louisiana

**WRIT GRANTED; JUDGMENT REVERSED IN PART**
**AUGUST 19, 2025**

DNA

DLD

RML

This is a criminal case. Relator, the State of Louisiana ("State"), seeks review of the district court's April 7, 2025 judgment, which granted in part and denied in part the "Motion for Suppression of Statements" ("Motion to Suppress") filed by Respondent, Gerard Hill ("Mr. Hill"). For the following reasons, we grant the State's writ application and reverse the district court's judgment insofar as it granted Mr. Hill's Motion to Suppress in part and suppressed some of his statements.

**RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On July 25, 2024, the State charged Mr. Hill by grand jury indictment with second degree murder with a firearm in violation of La. R.S. 14:30.1. When Mr. Hill appeared for arraignment on August 5, 2024, he pled not guilty to the charge. Then, on August 22, 2024, Mr. Hill filed his Motion to Suppress[1] wherein he sought "[s]uppression . . . of all involuntary statements obtained in violation of [his] Fifth Amendment rights as well as his rights under Article 1, Sections 13 and 16 of the Louisiana Constitution and La. R.S. 15:451." In terms of the United States Constitution, Mr. Hill also requested suppression pursuant to the Due

---

[1] Mr. Hill filed his Motion to Suppress as part of an "Omnibus Motion for Discovery; Motion to Preserve Evidence; Motion for Suppression of Statements, Evidence and Identifications; and Motion for a Preliminary Examination."

Process Clause, the Sixth Amendment right to counsel, and the Fourth Amendment, as well as "all other applicable constitutional and statutory provisions." Mr. Hill further requested suppression "pursuant to [*Miranda v. Arizona*], 384 U.S. 436 (1966) and its progeny under both the state and federal constitutions." Thereafter, the district court held a hearing on Mr. Hill's Motion to Suppress on February 13 and 14, 2025.

## **Hearing**

### *Detective James Fyfe Testimony*

Detective James Fyfe ("Det. Fyfe") testified that in April 2024 he was assigned to the New Orleans Police Department's ("NOPD") Homicide Section and was assigned as lead homicide investigator for the subject murder. Det. Fyfe testified that the NOPD became aware of a homicide at 500 St. Maurice Avenue in New Orleans, Louisiana, because of a 911 call made by Mr. Hill wherein he stated that he had shot someone inside his apartment. Det. Fyfe explained that in response to the 911 call, some initial officers were dispatched to the scene to make sure it was safe and to investigate the reason for the call. During Det. Fyfe's testimony, the State introduced Exhibits 1 and 2, the body-worn camera footage of Sergeant James Doaty, Jr. ("Sgt. Doaty") and the body-worn camera footage of another officer who responded as backup on the scene, respectively.[2]

---

[2] Det. Fyfe stated in his testimony that he did not recall the name of the officer from whom the Exhibit 2 body-worm camera footage came.

*Sergeant James Doaty, Jr. Testimony and Exhibit 1*

Sgt. Doaty[3] testified that on April 4, 2024, he was working for the Fifth Police District of the NOPD, on which date he arrested Mr. Hill inside of Mr. Hill's residence. Sgt. Doaty explained that, prior to the arrest, he arrived at Mr. Hill's apartment on the limited information that "a person [had been] shot at that location." Sgt. Doaty clarified that upon his arrival, he "[did not] have any additional information from the [911] dispatcher," including who shot the victim and the status of the victim. While Sgt. Doaty testified, the State played footage from his body-worn camera footage from the subject incident, and Sgt. Doaty described what was happening.

At the outset, the footage revealed Sgt. Doaty knocking on a door and identifying himself as a police officer before Mr. Hill opened the door. Sgt. Doaty then asked Mr. Hill, what was "going on," and he responded "[she is] laying down on the side of the bed." Then, Sgt. Doaty asked Mr. Hill if he had shot somebody, to which Mr. Hill responded, "yes, sir." Sgt. Doaty next asked Mr. Hill where the weapon was, and Mr. Hill stated it was on the dresser as Sgt. Doaty crossed the threshold of the front door into the residence. Subsequently, Sgt. Doaty asked Mr. Hill "what happened," and he stated that the victim "was smoking crack, which I [do not] . . . I picked up the . . ." Sgt. Doaty interrupted Mr. Hill to ask where the victim was shot, and he responded, "In her side." Thereafter, Sgt. Doaty instructed Mr. Hill to have a seat on the couch. When counsel for the State asked Sgt. Doaty what his "primary concern" was when "asking those [preliminary] questions," he responded, "A couple of things. My primary concern was to ascertain were there

---

[3] The index of the hearing transcript lists Sgt. Doaty's full name as "James Doaty Oakes, Jr.," but Sgt. Doaty introduced himself as "Sergeant James Doaty, Jr."

still armed perpetrators at the location, ascertain the facts as to what exactly happened, and kind of protect the scene, if need be." Counsel for the State then asked Sgt. Doaty what his "next concern" was "after getting the information" from Mr. Hill, and he responded, "My next concern was to check on the victim to see exactly what her status was. And I noticed that Mr. Hill was handicapped, so I wanted him to sit down on the couch so that he [would not] fall."

Thereafter, the State played more of the body-worn camera footage, which depicted Sgt. Doaty walk into a bedroom; check on the victim; radio to dispatch that an unresponsive female was suffering from a gunshot wound on her left side; ask for EMS personnel; and advise that he had the suspect in the residence with him. When counsel for the State asked Sgt. Doaty whether he had, at that point, "made a decision as to whether or not [he was] going to arrest [Mr. Hill]," Sgt. Doaty responded, "no, sir, not at this time" because he did not have "all of the facts" and was "still unclear what was going on." Sgt. Doaty further testified he "just wanted to check on the victim and then to find out exactly what happened at that point" and "[did not] have any reasonable suspicion to make an arrest at that time." Counsel for the State then asked Sgt. Doaty for "some of the factors [he was] trying to determine before [he] made an arrest," and he responded that he "was trying to ascertain the facts to see if this was some type of self-defense type [of] situation, if this was justifiable, all that type of stuff."

Subsequently, the State resumed playing the footage, and it depicted Sgt. Doaty exit the bedroom, enter the living room where Mr. Hill remained seated on the couch, and again ask Mr. Hill what happened. During the footage, Mr. Hill then explained that he encountered the victim earlier that day while out picking up another bottle of alcohol, noting that he and the victim "knew each other

4

previously"; they went to his residence; they had a "sexual encounter"; and then the victim "pulled out crack and started smoking." Mr. Hill continued explaining to Sgt. Doaty that he had been "twenty-five years clean. I take a little hit of 'that s---.' She turned around and wanted to take the money and not wanted [to do] nothing, and . . . I really [do not] know, man . . ." During the footage, Sgt. Doaty can be heard interrupting Mr. Hill and then seen placing Mr. Hill in handcuffs.

The footage revealed Mr. Hill became agitated while Sgt. Doaty placed the handcuffs on him, to which Sgt. Doaty responded: "Dude, you just shot somebody, calm down." While continuing to try to place the handcuffs on Mr. Hill, Sgt. Doaty then repeatedly told Mr. Hill to calm down and to relax, and Mr. Hill ultimately stated, "I knew I did it." The footage then showed Sgt. Doaty walk to the door to await backup and Sgt. Doaty can be heard explaining to Mr. Hill that he would be advised of his rights. Regarding this section of the footage, Sgt. Doaty testified that he could not ask any further questions of Mr. Hill because he did not have a "*Miranda* card" with him to *Mirandize* Mr. Hill. Sgt. Doaty stated that he knew other officers were on their way and that once they arrived, he ordered an officer to *Mirandize* Mr. Hill.

***Exhibit 2 – Body-Worn Camera Footage of Another Officer***

In addition to Sgt. Doaty's body-worn camera footage, the State also introduced into evidence the body-worn camera footage of another office.[4] As depicted therein, backup officers entered Mr. Hill's residence where he sat on the couch and in handcuffs. The footage revealed the officer wearing the body-worn camera advise Mr. Hill of his rights after being informed by Sgt. Doaty that Mr. Hill had not yet been so advised. Thereafter, Mr. Hill stated that he understood his

---

[4] The name of the backup, responding officer is unclear from the State's writ application.

rights, and he provided his name to the officer when asked. When the officer subsequently asked who the victim was to Mr. Hill, he responded that the victim was a "trickster to me" whose name was "a mystery to" him. Thereafter, another officer can be seen waving to get the attention of the officer wearing the body-worn camera and heard saying, "just stop." Thereafter, the officer wearing the body-worn camera walked away from Mr. Hill and other officers can be seen in the background speaking with Mr. Hill though the conversation is not audible on the footage.

As the footage continued, the officer wearing the body-worn camera ultimately returned to Mr. Hill and, for approximately forty-five minutes, the officers can be heard discussing various topics with him, including his health, people he knew at the police department, and the shooting itself. At one point, the officer wearing the body-worn camera asked Mr. Hill, "What happened tonight?" and "What made you shoot this woman?". Mr. Hill responded, "she reneged on the situation involving sexual acts." When asked if the victim was a prostitute, Mr. Hill responded that he did not know but that this was his "second time having an encounter with her." Mr. Hill explained that when the victim reneged on the sexual arrangement, he reached in a drawer, told her to give his money back, and "from there [he did not] know" what happened. Rather, according to Mr. Hill, the next thing he remembered was seeing blood and dialing 911.

## Judgment

On April 7, 2025, the district court issued its judgment and written reasons,[5] The judgment denied Mr. Hill's Motion to Suppress in part and granted it in part.

---

[5] The district court labeled the judgment as "Opinion and Order."

The district court broke down the statements at issue into three sets, deeming the first set admissible and the second and third sets suppressed.

Specifically, in terms of the first set of statements, the district court denied Mr. Hill's Motion to Suppress regarding the following statements he made in response to Sgt. Doaty's initial questions at the door.

Sgt. Doaty: "What do you got going on, brother?"

Mr. Hill: "She layin' down on her side over there."

Sgt. Doaty: "You shot somebody?"

Mr. Hill; "Yes sir."

Sgt. Doaty: "Where's the weapon?"

Mr. Hill: "It's sitting on the dresser."

(Excerpted from the district court's judgment.) The district court reasoned that Mr. Hill "was not in police custody when Sgt. Doaty was questioning him at his door." The district court further reasoned that "Sgt. Doaty's first three questions [were] investigatory in nature and aimed to ensure officer safety," such that "Mr. Hill's answers in response [were] admissible."

However, the district court granted Mr. Hill's Motion to Suppress with respect to the second set of statements made by Mr. Hill. The second set included the subsequent statements Mr. Hill made to Sgt. Doaty at the door, specifically his answers during the following colloquy:

Sgt. Doaty: "What happened?"

Mr. Hill: "We were smoking crack . . ."

Sgt. Doaty: "Where did you shoot at?"

Mr. Hill: "In her side."

Sgt. Doaty: "Alright. Have a seat on that couch right there. Sit down right there, sit down. Just sit down."

(Excerpted from the district court's judgment.) As reasoned by the district court, "Sgt. Doaty's continued questioning violate[d] the Due Process Clause, shifting from a preliminary investigation to an improper interrogation."

Additionally, the second set of statements, as designated by the district court, included those Mr. Hill made after Sgt. Doaty instructed him to sit on the couch, checked on the victim, and again asked what happened but prior to Sgt. Doaty placing him under arrest. The district court found that "Mr. Hill was in custody at the time the . . . statements were made" because "the combination of Sgt. Doaty's actions, following Mr. Hill's admissions, would cause any reasonable person in his position to discern they were not free to move, much less free to leave the premises of their home." As explained by the district court, "[d]espite this custodial setting, Sgt. Doaty failed to advise Mr. Hill of his *Miranda* rights and continue[d] to question Mr. Hill" even though there was "no immediate threat to the investigation nor to officer safety" because "once Mr. Hill was ordered to sit on the couch, he appeared calm, compliant, unarmed, and physically vulnerable (Mr. Hill was barely clothed and speaking with slurred speech)."

Further, as part of the second set of statements that the district court suppressed, the district court included the conversation between Sgt. Doaty and Mr. Hill as Sgt. Doaty placed him in handcuffs. The district court ruled "[t]he nature of this custodial interrogation became more evident when Sgt. Doaty place[d] Mr. Hill in handcuffs," such that the following statements also had to be suppressed:

Sgt. Doaty: "I'm going to have to detain you. Put your hands—"

8

Mr. Hill: "I understand. I'm not moving."

Sgt. Doaty: "Put your hands right here, have a seat right there."

*Mr. Hill says something inaudible.*

Sgt. Doaty: "Dude, you just shot somebody, calm down."

Mr. Hill: "I'm asking you—"

Sgt. Doaty: I am. Calm down.

Mr. Hill: I'm asking you to make sure—

Sgt. Doaty: I am. Calm down. Just relax.

Mr. Hill: Alright. I'm not going to get up to tell you anything. I knew I did it; but I'm not going to let nobody take nothing.

Sgt. Doaty: Turn your head this way.

(Excerpted from the district court's judgment.) The district court reasoned that because "Sgt. Doaty fail[ed] to advise Mr. Hill of his *Miranda* rights when detaining him and simultaneously reinforce[d] his alleged culpability by saying, 'You shot somebody,'" the "incriminating response [to] that statement—'I knew I did it'—was elicited in violation of his constitutional rights."

Turning to the third set of statements, the district court categorized these as the statements made by Mr. Hill after the unidentified officer wearing the body-worn camera in the footage admitted as State's Exhibit 2 administered the *Miranda* warning to Mr. Hill. The district court suppressed these statements, in part, on the basis that "officers must cease questioning once another officer instructs them to stop or if there is ambiguity regarding whether the defendant understood their rights." As described by the district court, Mr. Hill stated he understood his *Miranda* rights, but an officer subsequently told the questioning officer to "stop talking," such that the questioning officer should have stopped. The district court

9

stated it was also suppressing Mr. Hill's post-*Miranda* statements on the basis that "a subsequent officer, whose body-worn camera footage [was] not available to [the district court] is observed questioning Mr. Hill." According to the district court, "without this footage, [the district court was] unable to ascertain the content of the exchange or determine whether Mr. Hill invoked his constitutional rights." The district court further reasoned the entire exchange in State's Exhibit 2 had to "be suppressed as fruit of the poisonous tree" because of the "improper questioning of Mr. Hill in State's Ex[hibit] 1" (Sgt. Doaty's body-worn camera footage).

## ASSIGNMENT OF ERROR

In its writ application to this Court, the State asserts one assignment of error, contending "[t]he [district] court abused its discretion by suppressing statements made by [Mr. Hill] on the scene." This Court ordered Mr. Hill to file a response to the State's writ application but did not receive one from him. Before resolving the issues raised by the State's writ application, we begin with the standard of review applicable to motions to suppress.

## STANDARD OF REVIEW

The district courts are afforded great discretion when ruling on motions to suppress, such that an appellate court will not disturb a district court's ruling on a motion to suppress absent an abuse of that discretion. *State v. Debose*, 2024-0217, p. 6 (La. App. 4 Cir. 6/13/24), 390 So.3d 971, 977 (citing *State v. Willis*, 2022-0452, pp. 6-7 (La. App. 4 Cir. 9/1/22), 348 So.3d 167, 172). An appellate court affords "great weight" to the district court's ruling on a motion to suppress "because the [district] court ha[d] the opportunity to observe the witnesses and weigh the credibility of their testimony." *Id.* (alteration in original) (quoting *Willis*, 2022-0452, p. 7, 348 So.3d at 172. However, as this Court has further explained, "a

10

motion to suppress presents a mixed question of law and fact." *Id.* at p. 7, 390 So.3d at 977. As such, "the appellate court reviews the underlying facts for an abuse of discretion 'but reviews conclusions to be drawn from those facts *de novo*.'" *Id.* Conversely, when the facts are not in dispute, "the appellate court need only 'consider whether the trial court came to the proper legal determination under the undisputed facts.'" *Id.* In the matter *sub judice*, the underlying facts are not in dispute. Accordingly, we will conduct a *de novo* review of the district court's judgment.

## DISCUSSION

As stated previously, the State contends that the district court erred in granting Mr. Hill's Motion to Suppress in part. Regarding motions to suppress, La. C.Cr.P. art. 703(B) provides that "[a] defendant may move on any constitutional ground to suppress a confession or statement of any nature made by the defendant." In pertinent part, La. C.Cr.P. art. 703(D) states that "[o]n the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant." *See also State v. Willis*, 2022-0452, p. 8 (La. App. 4 Cir. 9/1/22), 348 So.3d 167, 173 (citing La. C.Cr.P. art. 703(D)). Additionally, La. R.S. 15:451 explains that "[b]efore what purports to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." Thus, at the hearing on Mr. Hill's Motion to Suppress, the State bore the burden of proving the admissibility of his statements. Accordingly, we must determine whether the State met this burden. We separate

11

our analysis into Mr. Hill's second and third sets of statements (as defined by the district court) so as to focus in each section on the law applicable to the admissibility of those statements.

**<u>Second Set of Statements</u>**

As summarized previously, Mr. Hill's second set of statements occurred before he received a *Miranda* warning and included Mr. Hill's responses to Sgt. Doaty asking Mr. Hill what happened at the front door; Sgt. Doaty again asking Mr. Hill what happened after having instructed Mr. Hill to sit on the couch while he checked on the victim; and Sgt. Doaty's conversation with Mr. Hill while the former placed the latter in handcuffs. The district court suppressed these statements on the basis that this situation was a custodial interrogation, such that Mr. Hill should have received his *Miranda* rights before these conversations occurred. Thus, we turn to the laws on custodial interrogations and *Miranda* warnings.

As to "the free and voluntary nature of confessions and statements, both the Louisiana and United States Constitutions provide 'procedural safeguards effective to secure the privilege against self-incrimination.'" *Willis*, 2022-0452, p. 8, 348 So.3d at 173 (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612). In this regard, the Fifth Amendment to the United States Constitution states that no person "shall be compelled in any criminal case to be a witness against himself . . . ." In interpreting the Fifth Amendment in *Miranda*, the United States Supreme Court held "that [it] is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." 384 U.S. at 467, 86 S.Ct. at 1624. Additionally, in *Miranda*, the United States Supreme Court held that "[p]rior to any questioning, [a person who has been taken into custody or

otherwise deprived of his freedom of action in any significant way] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444, 86 S.Ct. at 1612.

Turning to the Louisiana Constitution, La. Const. art. I, § 13 (1974) pertains to the "[r]ights of the [a]ccused" and states that "[w]hen any person has been arrested or detained in connection with the investigation or commission of any offense, he [or she] shall be advised fully of the reason for his [or her] arrest or detention, his [or her] right to remain silent, his [or her] right against self[-]incrimination, his [or her] right to the assistance of counsel and, if indigent, his [or her] right to court appointed counsel." *See also* La. C.Cr.P. art. 218.1 (explaining that if someone is "arrested or detained in connection with the investigation or commission of any offense," then "he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel"). In previously discussing these provisions from the United States and Louisiana Constitutions, this Court quoted the following excerpt from an opinion issued by the Louisiana Fifth Circuit Court of Appeal:

> Before an inculpatory statement made during a custodial interrogation[6] may be introduced into evidence, the State must prove, beyond a reasonable doubt, that the defendant was first advised of his *Miranda* rights, that he voluntarily and intelligently waived them, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducements, or promises.

---

[6] This Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Willis*, 2022-0452, p. 10, 345 So.3d at 173-74 (quoting *State v. Marzett*, p. 11 (La. App. 4 Cir. 6/9/10), 40 So.3d 1204, 1211).

*Willis*, 2022-0452, p. 9, 348 So.3d at 173 (quoting *State v. Chester*, 2019-0363, pp. 30-31 (La. App. 5 Cir. 2/3/21), 314 So.3d 914, 944).

In *State v. Bernard*, the Louisiana Supreme Court delineated the three factors that must be present so as to mandate the advisement of *Miranda* rights: "(1) the defendant is in 'custody' or significantly deprived of freedom, (2) there is an 'interrogation,' and (3) the interrogation is conducted by a 'law enforcement officer' or someone acting as their agent." 2009-1178, p. 5 (La. 3/16/10), 31 So.3d 1025, 1029. For purposes of *Miranda*, a suspect is considered to be in custody if "a reasonable person in the suspect's position would have understood the situation to constitute a restraint of freedom of movement of the degree associated with formal arrest." *Willis*, 2022-0452, p. 10, 345 So.3d at 174 (quoting *State v. Barabin*, 2013-0334, p. 5 (La. App. 4 Cir. 9/11/13), 124 So.3d 1121, 1124). As such, "[c]ustodial interrogation includes situations which fall short of an actual arrest but where the accused is questioned by the police in a setting which indicated that [the accused] has been deprived of his freedom of action in a significant way." *Id.* (second alteration in original) (quoting *State v. Alford*, 29,343, p. 6 (La. App. 2 Cir. 5/9/97), 694 So.2d 1162, 1166).

In terms of the custody factor, this Court recently explained that

> [c]ustody is decided by two distinct inquiries: an objective assessment of the circumstances surrounding the interrogation to determine whether there is a formal arrest or restraint on freedom of the degree associated with formal arrest; and second, an evaluation of how a reasonable person in the position of the interviewee would gauge the breadth of his freedom of action.

*State v. Atkins*, 2025-0186, p. 8 (La. App. 4 Cir. 5/21/25), ___ So.3d ___, ___, 2025 WL 1462073, at *4 (quoting *State v. Hankton*, 2012-0466, p. 13 (La. App. 4 Cir. 4/20/14), 140 So.3d 398, 407). Further, as recently explained by this Court,

"[t]o evaluate how a reasonable person in the defendant's position would 'gauge the breadth of his freedom of action,' courts review the totality of the circumstances surrounding the interrogation." *Id.* (quoting *State v. Robertson*, 2017-0398 p. 3 (La. App. 4 Cir. 5/12/17), 219 So.3d 1125, 1127-28). This totality of the circumstances review includes consideration of "any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave, but ignoring the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* Relevant factors include the location of the questioning; the duration of the questioning; statements made during the interview; the presence or absence of physical restraints during the questioning; and the release of the interviewee at the end of the questioning. *Id.*, 2025-0186, p. 9, ___ So.3d at ___, 2025 WL 1462073, at *4 (quoting *Howes v. Fields*, 565 U.S. 499, 509, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012)). Further, "pointed or accusatory questioning may indicate to a reasonable person that he or she is not free to leave." *State v. Noehl*, 2024-01224, p. 13 (La. 6/27/25), ___ So.3d ___, ___, 2025 WL 1788036, at *7.

"[T]temporary detentions that fall short of circumstances associated with a formal arrest are not considered 'custody' for *Miranda* purposes, and statements made during such a temporary detention are not rendered inadmissible based on the absence of *Miranda* warnings." *Atkins*, 2025-0186, p. 12, ___ So.3d at ___, 2025 WL 1462073, at *6. This is true even in instances when officers instruct someone to sit down in a particular spot while they handle the situation at hand. *Id.* (wherein this Court held that a custodial interrogation for *Miranda* purposes had not occurred even though the officers asked the defendant to have a seat to prevent him from potentially accessing a hidden firearm and to prevent his continued

15

harassment of the victim). Even "the use of handcuffs does not necessarily escalate a detention into a state of being 'in custody' for *Miranda* purposes," particularly if the officer has "reasonable suspicion to detain the defendant while . . . question[ing] him." *Barabin*, 2013-0334, p. 6, 124 So.3d at 1124. Moreover, "[e]ven when a defendant is in custody, his spontaneous statements need not be suppressed if they are not the product of [the] custodial interrogation." *Id.* at p. 11, 124 So.3d at 1127 (citing *State v. Smith*, 2000–1838, pp. 3-4 (La.5/25/01), 785 So.2d 815, 817).

Turning to the matter *sub judice*, the questions Sgt. Doaty asked at Mr. Hill's front door and after he entered Mr. Hill's apartment were not part of a custodial detention. Nor did Sgt. Doaty's instruction to Mr. Hill to sit down on the sofa result in this being a custodial detention just as this Court recently found in *Atkins*. Rather, in the totality of the circumstances, Sgt. Doaty's intent in entering the apartment and asking Mr. Hill to have a seat was not "to affect an extended or significant restraint on [Mr. Hill]'s freedom," but for Mr. Hill's health and well-being (given his handicapped condition) to allow Sgt. Doaty the opportunity to check on the victim and determine the location of the weapon to make sure it was secure. *Atkins*, 2025-0186, p. 12, ___ So.3d at ___, 2025 WL 1462073, at *6. Further, Sgt. Doaty's questions were of a general nature in response to Mr. Hill's initial statement that he had shot someone (e.g., "Where's the weapon?" and "What happened?"), not pointed or accusatory.[7] *See Noehl*, 2024-01224, p. 13, ___ So.3d at ___, 2025 WL 1788036, at *7. In our objective assessment of the circumstances

---

[7] As outlined previously, Mr. Hill answered affirmatively that he had shot someone in his first set of statements (as categorized by the district court) to Sgt. Doaty when he answered the knock at his door. The district court denied Mr. Hill's Motion to Suppress with regard to his first set of statements.

surrounding the interrogation, we find there was no formal arrest or restraint on freedom of the degree associated with a formal arrest. The record shows that a reasonable person in Mr. Hill's position would not believe he or she was deprived of their freedom in any significant way or otherwise detained during this time.

When Sgt. Doaty thereafter placed Mr. Hill in handcuffs, he did so because Mr. Hill had already stated that he shot the victim, such that Sgt. Doaty had reasonable suspicion to detain him at that point. *See Barabin*, 2013-0334, p. 6, 124 So.3d at 1124. Though the district court ruled that Mr. Hill's statement during the handcuffing—"I knew I did it."—was in response to Sgt. Doaty stating, "Dude, you just shot somebody, calm down," we disagree with this characterization that Sgt. Doaty's comment elicited Mr. Hill's statement. Rather, Mr. Hill made that statement after Sgt. Doaty merely asked him two more times to calm down and relax so that Sgt. Doaty could secure the handcuffs. Mr. Hill's statement of "I knew I did it." was a spontaneous statement he made, not the product of a custodial interrogation. *See Barbin*, p. 11, 124 So.3d at 1127 (citing *Smith*, 2000-1838, pp. 3-4, 785 So.2d at 817). Therefore, suppression of that statement was not warranted because "spontaneous statements need not be suppressed if they are not the product of a custodial interrogation." *Barabin*, 2013-0334, p. 11, 124 So.3d at 1127 (citing *Smith*, 2000-1838, pp. 3-4, 785 So.2d at 817). *Id.* In light of the foregoing, we find the district court erred in suppressing Mr. Hill's second set of statements.

**Admissibility of the Third Set of Statements**

The third set of statements, as categorized by the district court, were those Mr. Hill made after receiving his *Miranda* rights from the officer wearing the body-worn camera whose footage constituted State's Exhibit 2. The district court suppressed this set of statements on the basis that although "the initial questions in

17

State's Ex. 2 [the unknown officer's body-worn camera footage] were proper, due to the improper questioning of Mr. Hill in State's Ex. 1 [Sgt. Doaty's body-worn camera footage], Mr. Hill's entire [third set of] statement[s] should be suppressed as fruit of the poisonous tree." In support of this finding, the district court cited to *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) and *Wong Sun v. United States*, 371 U.S. 471, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

In discussing Mr. Hill's third set of statements, the district court listed two additional reasons it found these statements to be problematic. First, the district court noted that after the officer gave Mr. Hill his *Miranda* rights, another officer told that questioning officer to stop. Citing to *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), the district court stated the questioning officer needed to cease questioning after being instructed to stop. Second, the district court noted that during State's Exhibit 2, "a subsequent officer, whose body-worn camera footage [wa]s not available to this [c]ourt, is observed questioning Mr. Hill." The district court found that "[t]he absence of direct documentation of the second officer's interaction with Mr. Hill raises material concerns" because it was "unable to ascertain the content of the exchange or determine whether Mr. Hill invoked his constitutional rights."

We begin with the district court's finding that Mr. Hill's third set of statements had to be suppressed under the fruit of the poisonous tree doctrine. As this Court has explained, "the [fruit of the poisonous tree] doctrine serves to exclude from evidence the direct and indirect products of illegal violations of the Fourth Amendment" to the United States Constitution.[8] *State v. Nicholas*, 2010-

---

[8] The Fourth Amendment provides:

1188, p. 15 (La. App. 4 Cir. 10/20/10), 51 So.3d 98, 107-08. Also known as "[t]he exclusionary rule," it "bars, as illegal 'fruit of the poisonous tree,' any physical and verbal evidence obtained either during or as a direct result of an unlawful invasion." *State v. Williams*, 2020-46, p. 43 (La. App. 5 Cir. 12/30/20), 308 So.3d 791, 825 n.61 (citing *State v. Salinas*, 17-485 (La. App. 5 Cir. 7/6/18), 251 So.3d 1166, 1174). Not only does "[t]he rule extend[] to . . . primary evidence obtained during or as a direct result of an illegal search or seizure," but also to "evidence later discovered and found to be a derivative of illegality." *Id.* However, as this Court has further explained, "[w]hen there is no primary illegality, the 'fruit of the poisonous tree theory' does not apply." *State v. Cavalier*, 2014-0579, p. 19 (La. App. 4 Cir. 6/19/15), 171 So.3d 1117, 1129 (citing *State v. St. Hill*, 433 So.2d 395, 398 (La. App. 4th Cir.1983)). Accordingly, a trial court should not suppress evidence or statements subsequently obtained if the initial interaction with the defendant was not illegal. *Id.* Thus, to resolve whether the district court correctly suppressed Mr. Hill's third set of statements under the fruit of the poisonous tree doctrine, we must first determine whether there was an initial illegality during State's Exhibit 1 (Sgt. Doaty's body-worn camera footage) so as to render the doctrine applicable to the statements made in State's Exhibit 2 (the unknown officer's body-worn camera footage).

The district court found that Mr. Hill's first set of statements in State's Exhibit 1—his responses to the three questions initially asked by Sgt. Doaty at the front door—were admissible because Mr. Hill was not in police custody and

---

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

because Sgt. Doaty's questions were "investigatory in nature and aimed to ensure officer safety." The first set of statements include Mr. Hill's answers to Sgt. Doaty asking him "What do you got going on, brother?"; "You shot somebody?"; and "Where's the weapon?". We agree with the district court and thus find no reason to disturb this holding. *See State v. Estes*, 2014-781, p. 21 (La. App. 5 Cir. 2/25/15), 168 So.3d 847, 860 (explaining that "[t]he Louisiana Supreme Court has consistently held that '*Miranda* warnings are not a pre-requisite to admissibility of statements taken by officers during noncustodial, general, on-the-scene investigations, conducted to determine the facts and circumstances surrounding a possible crime'"). As determined in the previous section, Mr. Hill was not in custody when his second set of statements occurred (after Sgt. Doaty entered the residence and asked Mr. Hill to sit on the couch). Finding no primary illegality during Mr. Hill's interaction with Sgt. Doaty in State's Exhibit 1, the fruit of the poisonous tree doctrine does not apply to Mr. Hill's statements made during State's Exhibit 2.

The district court's alternate bases for suppressing Mr. Hill's third set of statements were also in error. Although the State introduced the body camera footage from only one of the other officers who questioned Mr. Hill after he received his *Miranda* rights and another officer told him to stop at one point, our review of that footage reveals that Mr. Hill acknowledged he understood his *Miranda* rights and answered questions voluntarily and without coercion. Though the district court questioned whether Mr. Hill may have invoked his constitutional rights during the brief period of time when the officer stepped away and other officers spoke to Mr. Hill and found the absence of additional body-worn camera footage to be problematic, we disagree. Mr. Hill's subsequent conversation with

the officers demonstrate "that he engaged in a course of conduct indicating waiver" of his rights. *Berguis*, 560 U.S. at 386, 130 S.Ct. at 2263. If Mr. Hill wanted to remain silent, he could have said nothing in response to the subsequent questioning or ended the interrogation but did not do so. *See id.* Instead, the footage reveals Mr. Hill freely speaking with the officers and continuing the conversation for approximately forty-five minutes.

In addition, we note that Mr. Hill admitted that he had been drinking earlier that day and may have engaged in drug use, but the footage establishes Mr. Hill did not exhibit difficulty comprehending and answering questions, such that this did not render his statements involuntary. *State v. Manning*, 2003-1982 p. 26 (La. 10/19/04), 885 So.2d 1044, 1074 (holding "the mere fact of drug or alcohol intoxication is insufficient standing alone to render a confession involuntary" because intoxication only "render[s] a confession involuntary if it negates a defendant's comprehension and renders him unconscious of the consequences of what he is saying"). Therefore, we find that the district court erred in suppressing Mr. Hill's third set of statements which were made after an officer advised him of his *Miranda* rights, which he acknowledged he understood, and which statements were not "fruit of the poisonous tree."

**DECREE**

For the foregoing reasons, we grant the State's writ application and reverse the district court's April 7, 2025 judgment, insofar as it granted Mr. Hill's Motion to Suppress in part and suppressed his second and third sets of statements.

**WRIT GRANTED; JUDGMENT REVERSED IN PART**